

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### NORTHERN DIVISION

**F I L E D**

**SEP 2 5 2024**

CLERK'S OFFICE
DETROIT

UNITED STATES OF AMERICA,

                  Plaintiff,

v.

D-1   JEFFREY BARTLETT,
D-2   ANDREW SEMENCHUK,
D-3   ADAM BALL,
D-4   BRIAN BARTLETT, and
D-5   ANTHONY THELEN,

                  Defendants.

Case No. 23-cr-20676

Hon. Thomas L. Ludington

Violations:
18 U.S.C. §1349 - Conspiracy to
Commit Wire Fraud
18 U.S.C. § 371 – Conspiracy to
Defraud the United States
18 U.S.C. § 1343 – Wire Fraud
Forfeiture

_____/

## SECOND SUPERSEDING INDICTMENT

The Grand Jury Charges:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.    The United States Department of Transportation (USDOT), through

the Federal Highway Administration (FHWA), funded highway construction

projects in the State of Michigan and throughout the United States. USDOT

typically funded 80-90 percent of the cost of individual highway construction

projects and states funded the remainder.

1

2.    The Michigan Department of Transportation (MDOT) was responsible for awarding highway construction contracts and for the administration of federal and state highway construction funds in the State of Michigan.

3.    Federal regulations required MDOT to negotiate engineering and survey contracts with the most qualified firms, and to pay a "fair and reasonable" rate determined by a calculation of direct labor costs and indirect costs, also known as overhead expenses.

4.    Surveying Solutions, Inc. (SSI), was a surveying company incorporated in August 2001 and doing business in the Eastern District of Michigan - Northern Division and elsewhere, which was awarded highway surveying and engineering contracts by MDOT.

5.    JEFFREY BARTLETT, ANDREW SEMENCHUK, ADAM BALL, BRIAN BARTLETT, and ANTHONY THELEN (the defendants) were executives of SSI.

6.    In accordance with federal regulations, MDOT reimbursed SSI for its direct labor costs based on SSI reports of the number of hours SSI employees worked on MDOT projects.

7.    MDOT reimbursed SSI for indirect costs, based on claims SSI made annually in a pre-qualification process which determined the rate MDOT used to reimburse and pay SSI for contracts it was awarded.

2

8.   MDOT paid SSI a fixed 11 percent fee, based on the direct and indirect costs SSI reported, to provide a profit margin.

9.   National Elevation Certificates, doing business as Southfield IT (Southfield IT), was a shell company created by the defendants and used by them, beginning in late 2015, to enrich themselves by falsifying invoices for technology services Southfield IT did not perform.

10.   2SI Development (2SI) and 3SI Building and Leasing (3SI) were companies located in SSI offices, which were owned and controlled by the defendants. These companies held title to real and personal property purchased with SSI assets.

11.   Federal regulations permitted MDOT to reimburse SSI for labor costs directly related to highway project contracts they were awarded. This included payroll.

12.   SSI submitted documentation to MDOT which misrepresented that certain individuals were "employees" of SSI and fraudulently inflated overhead costs reported to MDOT by including payroll and bonus payments to those individuals (ghost employees), as part of overhead costs.

13.   USDOT operated a Disadvantaged Business Enterprise (DBE) program which required that a portion of USDOT funds related to transportation projects be directed to small businesses owned by socially and economically disadvantaged

3

individuals. The effect of this program was to give those qualified businesses a preference in receiving USDOT contracts.

14.   For a business to be certified as a DBE, a qualifying individual had to own at least 51 percent of the business, establish they were disadvantaged, prove they controlled the business, and that the business could perform the work.

15.   The disadvantaged owner was also required to have actual control of the business, including ultimate managerial control over others and higher compensation than other owners and employees.

16.   Asian-Pacific Islanders were presumed to be disadvantaged under the DBE program.

17.   A DBE business was required to submit an application certifying that it met all the eligibility requirements and to periodically submit "no change" documentation, verifying that there were no changes to its initial application. SSI submitted this documentation throughout the conspiracy.

18.   Geo Precision Services, LLC. (GPS) or (Geo) was a company established by SEMENCHUK which, through him, was recognized as a DBE.

19.   "SSI Group" was a name used by the defendants when referring to their equal ownership of SSI, 2SI, 3SI, Geo Precision Services, and Southfield IT.

## COUNT ONE
### (18 U.S.C. § 1349, Conspiracy to Commit Wire Fraud)

D-1   JEFFREY BARTLETT,
D-2   ANDREW SEMENCHUK,
D-3   ADAM BALL,
D-4   BRIAN BARTLETT,
D-5   ANTHONY THELEN

The general allegations are included in this count.

20.    On or about February 25, 2011, through at least June 2019, in the

Eastern District of Michigan, Northern Division, defendants JEFFREY

BARTLETT, ANDREW SEMENCHUK, ADAM BALL, BRIAN BARTLETT,

and ANTHONY THELEN knowingly and voluntarily combined, conspired and

agreed with each other and others, known and unknown to the grand jury, to

commit the crime of wire fraud, that is, knowingly and with intent to defraud,

having devised and intending to devise a scheme and artifice to defraud and to

deprive another of money and property by means of false and fraudulent material

pretenses, representations, and promises, transmit and cause to be transmitted wire

communications in interstate commerce including email, writings, signs, signals,

pictures, and sounds, and the wire transfer of funds, in violation of Title 18, United

States Code, Sections 1343 and 1349.

### Object of the Conspiracy

21.    The object of the conspiracy and scheme was to defraud and deprive

5

USDOT and MDOT of money by means of false and fraudulent material pretenses, representations, and promises made to MDOT with the intent to trick MDOT into compensating SSI for overhead expenses SSI did not incur, or for which SSI was not entitled to receive compensation, as well as paying an inflated profit margin to SSI. It was also an object of the conspiracy that SSI be recognized as a DBE, and to accomplish that the defendants falsely certified that SEMENCHUK was a 51 percent owner of SSI, purchased SSI with his own funds, and otherwise met qualification requirements to receive DBE status and preferences. It was further an object of the conspiracy and the scheme for the defendants to split the illegally obtained payments equally among themselves and to use them for their personal benefit and enrichment.

### Manner and Means of the Conspiracy

**Disadvantaged Business Enterprise**

22.     In early 2011, the defendants decided that SEMENCHUK would join SSI and that to deceive MDOT into approving SSI as a DBE, they would falsely claim he did own 51 percent SSI and had ultimate managerial control.

23.     In or about June 2012, SEMENCHUK told MDOT and USDOT that assets of GPS were used to purchase 51 percent of SSI. Instead, as the defendants knew and intended, false invoices were sent from GPS to SSI for work that was never

6

performed, SSI paid those invoices, and SEMENCHUK used those funds to pretend that GPS assets were used to "purchase" SSI.

24.    As the defendants knew, SEMENCHUK was never a 51 percent owner of SSI and never had ultimate managerial control over SSI. As the defendants knew and agreed, SEMENCHUK was a 20 percent owner of SSI along with JEFFREY BARTLETT, ADAM BALL, BRIAN BARTLETT, and ANTHONY THELEN, each of whom also owned 20 percent of SSI.

25.    It was part of the conspiracy and scheme and with intent to deceive MDOT that on February 25, 2011, the defendants entered into a secret agreement which provided, in part, that they would each own a 20 percent undivided interest in SSI, 2SI, 3SI, and Geo Precision Services. That agreement read in part:

"Intent:
It is the intent of this agreement that the Buyers and Sellers will each own a 20 percent undivided interest in the above named companies at the completion of the "Buy In" period. Regardless of how the Articles of Incorporation, Stock Ownership, By Laws, etc. are written/retained; the intent is for all 5 parties to have equal ownership of the companies at the completion of the "Buy In" period."

7

26.    With intent to hide their scheme to defraud MDOT, the secret agreement

was signed and accepted by each defendant as follows:

**Sellers:**

Brian Bartlett
Jeffrey Bartlett
Anthony Thelen

**Buyers:**

Adam Ball
Andrew Semenchuk



27.    To further their scheme to defraud, to hide their secret agreement, to trick

MDOT and USDOT into awarding DBE status to SSI, and with the knowledge of

and intent to defraud by all the defendants, SSI repeatedly falsely certified that

SEMENCHUK purchased a 51 percent interest in SSI and had full managerial

control over SSI. The follow are examples of these false certifications:

| Date | Certifying Defendant(s) | Document |
|---|---|---|
| June 2, 2011 | Andrew Semenchuk | DBE Application for GEO |
| April 19, 2013 | Andrew Semenchuk | DBE Application for SSI |
| October 24, 2013 | Andrew Semenchuk Jeffrey Bartlett | MDOT "On-Site Visit" questionnaire. |
| July 25, 2016 | Andrew Semenchuk | No Change Affidavit |
| July 24, 2017 | Andrew Semenchuk | No Change Affidavit |
| July 25, 2018 | Andrew Semenchuk | No Change Affidavit |

28.     It was further part of the conspiracy and scheme to defraud that the

defendants enjoyed the benefits and preferences SSI received as a DBE during

significant parts of the conspiracy. They also joked between themselves about the

anticipated success of their scheme and how profitable it would be:

**RE: accts.**

| | |
|---|---|
| **From:** | Jeffrey Bartlett <jbartlett@ssi-mi.com> |
| **To:** | Adam Ball <aball@ssi-mi.com>, Brian Bartlett <bbartlett@ssi-mi.com>, Tony Thelen <tthelen@ssi-mi.com>, Andrew W. Semenchuk <semenchuk@ssi-mi.com> |
| **Date:** | Thu, 28 Aug 2014 16:40:57 -0400 |

Not bad for a bunch of white guys trying to be a minority-owned business. . . .

And we will be billing the FUCK out of August thru November for sure.

29.     On July 27, 2015, based on false information provided to MDOT and

USDOT by the defendants, SSI was granted DBE status and was thus

eligible to begin receiving the benefits and preferences that status conferred.

**Southfield IT**

30.     To further deceive MDOT, it was part of the conspiracy and the scheme to

defraud that the defendants falsely told MDOT that Southfield IT was an

independent third-party vendor providing technology services to SSI.

31.     It was part of the conspiracy and the scheme to defraud that the

defendants created fictitious contracts and invoices between SSI and Southfield IT

and used them to fraudulently inflate their overhead costs which were then

reimbursed by MDOT.

9

32.    It was further part of the conspiracy and scheme to defraud that the

defendants agreed that SEMENCHUK, in his capacity as president of SSI, would

sign fraudulent service agreements purporting to be arm's length agreements

between SSI and Southfield IT, and that SSI "paid" the false invoices for services

purporting to be rendered from Southfield IT to SSI.

33.    As part of the conspiracy and scheme to defraud, on February 17, 2015,

Southfield IT's bank account was opened, and listed BALL, as one of the signors.

This allowed the defendants to easily move the illegally obtained MDOT funds

back to themselves and their spouses from Southfield IT's bank account. As the

defendants agreed and with intent to defraud, 99.2 percent of Southfield IT's

"funding" came from SSI and 95.9 percent of the money SSI paid to Southfield IT

was ultimately transferred back to defendants and their spouses.

**2SI**

34.    With intent to defraud and to unjustly enrich defendants, SEMENCHUK

and JEFFREY BARTLETT, falsely told MDOT they did not control or own any

other companies. SEMENCHUK and JEFFREY BARTLETT made this false

representation with intent to deceive MDOT into paying the defendants, through

SSI, more in overhead costs and the fixed 11 percent fee than they were entitled to.

10

35.     It was part of the conspiracy and the scheme to defraud that the defendants owned and controlled 2SI and hid that fact from MDOT to obtain reimbursement to which SSI was not entitled. With intent to defraud, the defendants created lease agreements between 2SI and SSI for mobile surveying scanners and vehicles and claimed that SSI was making lease payments to 2SI, an independent third-party vendor. In fact, as the defendants knew, 2SI was part of the "SSI Group" and each defendant was a 20 percent owner of 2SI.

36.     The defendants agreed that JEFFREY BARTLETT would be listed as an owner of 2SI, and was a signer on the 2SI checking account.

37.     The defendants knew if they disclosed the fact that they owned and controlled 2SI and its mobile surveying scanners and vehicles, which SSI used for MDOT projects, they would only be entitled to reimbursement for normal ownership costs such as maintenance and depreciation. But, if they falsely claimed the scanners and vehicles were leased by SSI from 2SI, reimbursement would be substantially greater.

38.     From 2012 through at least June 2019, fraudulent claims submitted by SSI to MDOT relating to 2SI vehicles and equipment leases resulted in an overpayment of overhead costs and profits to SSI.

11

**3SI**

39.    It was also part of the conspiracy and the scheme to defraud that the

defendants used 3SI and concealed their control and ownership of it from MDOT

to facilitate the submission of fraudulent rent claims.

40.    The defendants knew that federal regulations controlling their contracts with

MDOT prohibited SSI to recover rental costs paid to a company they controlled,

and if the true relationship between SSI and 3SI had been disclosed to MDOT, SSI

would only be entitled to reimbursement for the normal costs of ownership.

41.    It was part of the conspiracy and scheme to defraud that the defendants

agreed to and did submit fraudulent claims to MDOT for rent payments from SSI

to 3SI, and that they hid from MDOT the fact that SSI and 3SI were controlled and

owned by them.

**Payroll**

42.    Throughout the conspiracy and scheme to defraud, the defendants knew

federal regulations only allowed payroll reimbursement for actual costs incurred in

work done on USDOT/MDOT projects.

43.    It was part of the conspiracy and scheme to defraud that the defendants

agreed to falsely claim that certain individuals were employed by SSI, when the

defendants knew those individuals were not.

44.     As part of the conspiracy and scheme to defraud, the defendants made false claims to MDOT for labor costs associated with the ghost employees. Those costs included bonuses as well as payroll and resulted in payments to the ghost employees that were higher than those paid to most actual SSI employees.

45.     To further the conspiracy and scheme to defraud, and to hide their illegal activity from MDOT, the defendants created false and fraudulent timesheets and federal income tax forms and used that documentation to trick MDOT officials into believing the ghost employees were employed by SSI.

**End of the Year Equalization**

46.     To further the conspiracy and scheme to defraud, at the end of each calendar year the defendants worked together to calculate income received that year by the SSI Group companies—SSI, 2SI, 3SI, Geo Precision Services, and Southfield IT—to make sure each defendant received 20 percent of the total profits from all the related SSI Group companies.

47.     It was further part of the conspiracy and scheme to defraud to conceal the fact that SEMENCHUK was not a 51 percent owner of SSI, that the SSI Group companies were controlled and owned equally by the defendants, that each defendant received 20 percent of the total profits, and that the defendants paid themselves and their wives bonuses and approved fictitious "loans" to each other that were never intended to be paid back.

48.    For instance, in late December 2017, in an email titled "SSI Equalization

Email 28DEC2017" JEFFREY BARTLETT wrote to SSI's accountant, "I guess I

personally was thinking more on the lines of getting "loans" from SSI in the 2017

year that we know would never be paid back and keep us all equal from year to

year." Three minutes later SEMENCHUK wrote the following email to the

defendants which included JEFFREY BARTLETT'S previous email:

**Re: Update & Question**

| | |
|---|---|
| **From:** | Andrew W. Semenchuk <semenchuk@ssi-mi.com> |
| **To:** | Jeffrey Bartlett <jbartlett@ssi-mi.com> |
| **Cc:** | ▮▮▮▮▮▮ Brian Bartlett <bbartlett@ssi-mi.com>, Adam Ball <aball@ssi-mi.com>, Tony Thelen <tthelen@ssi-mi.com> |
| **Date:** | Thu, 28 Dec 2017 14:13:01 -0500 |

exactly bonuses to keep me under $350 and the rest loans that will never be paid back.

Courtney has my check for the interest

Five minutes later BALL responded:

**RE: Update & Question**

| | |
|---|---|
| **From:** | Adam Ball <aball@ssi-mi.com> |
| **To:** | Andrew W. Semenchuk <semenchuk@ssi-mi.com>, Jeffrey Bartlett <jbartlett@ssi-mi.com> |
| **Cc:** | ▮▮▮▮▮▮ Brian Bartlett <bbartlett@ssi-mi.com>, Tony Thelen <tthelen@ssi-mi.com> |
| **Date:** | Thu, 28 Dec 2017 14:17:58 -0500 |

I thought there was some discussion of doing the loans 1/1/2018 so that 2017 did not show monster loans on the books to the owners for DBE

Adam R. Ball, P.E.
Project Engineer
Surveying Solutions, Inc.

14

Nine minutes later BRIAN BARTLETT responded:

**RE: Update & Question**

| | |
|---|---|
| From: | Brian Bartlett <bbartlett@ssi-mi.com> |
| To: | Adam Ball <aball@ssi-mi.com>, Andrew W. Semenchuk <semenchuk@ssi-mi.com>, Jeffrey Bartlett <jbartlett@ssi-mi.com> |
| Cc: | ▓▓▓▓▓▓▓▓▓▓▓ Tony Thelen <tthelen@ssi-mi.com> |
| Date: | Thu, 28 Dec 2017 14:27:07 -0500 |

I thought the 2018 loans were for if we received a bunch more money and were not able to divert it to 2SI and NEC because they are maxed out. Then we would do so after the first of the year for Adam, Brian, Tony and Jeff, Andy would get loans from SSI then....

Brian Bartlett, P.S.
Surveying Solutions, Inc.

49.     During the conspiracy the defendants obtained more in reimbursement and

profit payments from MDOT than they were entitled to, and those payments were

made by the wire transfer of funds in interstate commerce from MDOT's financial

institution Comerica Bank in Michigan through Huntington National Bank, SSI's

financial institution in Columbus, Ohio.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
(18 U.S.C. § 371, Conspiracy to Defraud the United States)

D-1   JEFFREY BARTLETT,
D-2   ANDREW SEMENCHUK,
D-3   ADAM BALL,
D-4   BRIAN BARTLETT,
D-5   ANTHONY THELEN

The general allegations and paragraphs 20 - 49 are included in this count.

15

50.    On or about February 25, 2011, through at least June 2019, in the

Eastern District of Michigan - Northern Division, defendants JEFFREY

BARTLETT, ANDREW SEMENCHUK, ADAM BALL, BRIAN

BARTLETT, and ANTHONY THELEN knowingly and voluntarily combined,

conspired, and agreed with each other and others, known and unknown to the

grand jury, to defraud the United States and an agency of the United States, the

United States Department of Transportation.

## Object of the Conspiracy

51.    The object of the conspiracy and scheme was to defraud and deprive

USDOT of money by means of false and fraudulent material pretenses,

representations, and promises made to MDOT with the intent to trick MDOT into

compensating SSI for overhead expenses SSI did not incur, or for which SSI was

not entitled to receive compensation, as well as paying an inflated profit margin to

SSI. It was also an object of the conspiracy that SSI be recognized as a DBE, and

to accomplish that the defendants falsely certified that SEMENCHUK was a 51

percent owner of SSI, purchased SSI with his own funds, and otherwise met

qualification requirements to receive DBE status and preferences. It was further an

object of the conspiracy and the scheme for the defendants to split the illegally

obtained payments equally among themselves and to use them for their personal

benefit and enrichment.

## Overt Acts

a.     On April 19, 2013, as the defendants agreed and with intent to defraud, SEMENCHUK pretended to be a 51% owner of SSI and applied for DBE status for SSI.

b.     On October 24, 2013, as the defendants agreed, SEMENCHUK and JEFFREY BARTLETT signed MDOT "On-Site Visit" questionnaires falsely certifying that neither they nor any other member of SSI had an ownership interest in another firm.

c.     On February 17, 2015, the defendants, with intent to defraud, opened a bank account in the name of Southfield IT and listed BALL as one of the signors. This account was used by the defendants to move illegally obtained funds back to themselves and their spouses from Southfield IT's bank account.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 3 THROUGH 15
### (18 U.S.C. §§ 1343, 2 - Wire Fraud, Aiding and Abetting)

D-1   JEFFREY BARTLETT,
D-2   ANDREW SEMENCHUK,
D-3   ADAM BALL,
D-4   BRIAN BARTLETT,
D-5   ANTHONY THELEN

The general allegations and paragraphs 20-51 are included in these counts.

17

52.     The defendants and others knowingly devised and executed, and aided and abetted each other in devising and executing, a scheme to defraud and to obtain money from MDOT by means of false and fraudulent material pretenses, representations and promises.

53.     On the dates set forth below, in the Eastern District of Michigan, Northern Division, and elsewhere, with intent to defraud and for the purpose of executing the scheme, the defendants and others transmitted and caused the transmission of wire communications in interstate commerce. These communications included the transfer of money, email, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme.

54.     Each of the following constitutes a separate count of this Indictment:

| Count | Date | Description of Wire Transmission |
|-------|------|-----------------------------------|
| 3 | December 7, 2018 | Transfer of $6,824.16 from Comerica Bank servers in Auburn Hills, Michigan through Huntington National Bank servers in Columbus, Ohio. |
| 4 | December 7, 2018 | Transfer of $74,570.94 from Comerica Bank servers in Auburn Hills, Michigan through Huntington National Bank servers in Columbus, Ohio. |
| 5 | December 10, 2018 | Transfer of $19,545,10 from Comerica Bank servers in Auburn Hills, Michigan through Huntington National Bank servers in Columbus, Ohio. |

| Count | Date | Description of Wire Transmission |
|-------|------|----------------------------------|
| 6 | December 12, 2018 | Transfer of $73,038.61 from Comerica Bank servers in Auburn Hills, Michigan through Huntington National Bank servers in Columbus, Ohio. |
| 7 | December 12, 2018 | Transfer of $116,353.50 from Comerica Bank servers in Auburn Hills, Michigan through Huntington National Bank servers in Columbus, Ohio. |
| 8 | December 12, 2018 | Transfer of $26,139.49 from Comerica Bank servers in Auburn Hills, Michigan through Huntington National Bank servers in Columbus, Ohio. |
| 9 | December 19, 2018 | Transfer of $125,351.21 from Comerica Bank servers in Auburn Hills, Michigan through Huntington National Bank servers in Columbus, Ohio. |
| 10 | December 19, 2018 | Transfer of $80,238.15 from Comerica Bank servers in Auburn Hills, Michigan through Huntington National Bank servers in Columbus, Ohio. |
| 11 | June 21, 2019 | Transfer of $75,451.26 from Comerica Bank servers in Auburn Hills, Michigan through Huntington National Bank servers in Columbus, Ohio. |
| 12 | June 27, 2019 | Transfer of $120,391.62 from Comerica Bank servers in Auburn Hills, Michigan through Huntington National Bank servers in Columbus, Ohio. |
| 13 | July 25, 2019 | Transfer of $105,143.78 from Comerica Bank servers in Auburn Hills, Michigan through Huntington National Bank servers in Columbus, Ohio |
| 14 | July 25, 2019 | Transfer of $65,103.49 from Comerica Bank servers in Auburn Hills, Michigan through Huntington National Bank servers in Columbus, Ohio |

| Count | Date | Description of Wire Transmission |
|-------|------|----------------------------------|
| 15 | July 29, 2019 | Transfer of $61,935.75 from Comerica Bank servers in Auburn Hills, Michigan through Huntington National Bank servers in Columbus, Ohio |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## FORFEITURE ALLEGATIONS

(Criminal Forfeiture - 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The allegations contained in this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as incorporated by 28 U.S.C. § 2461(c), and Federal Rule of Criminal Procedure 32.2.

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of Count One, Conspiracy to Commit Wire Fraud offense in violation of 18 U.S.C. § 1349, Count Two, Conspiracy to Defraud the United States in violation of 18 U.S.C. § 371, and Counts Three-Fifteen Wire Fraud, the defendants shall forfeit to the United States of America their interest in any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses charged in Counts One through Fifteen, including but not limited to all or part of the following property:

20

FUNDS

1.  One Thousand Seven Hundred Fifty-Six Dollars and Three Cents ($1,756.03) in U.S. Currency from Huntington National Bank Account No. XXXXXXX0024:

2.  Thirty-Eight Thousand Four Hundred Eighty-Nine Dollars ($38,489.00) in U.S. Currency from Huntington National Bank Account No. XXXXXXX3366;

3.  Twenty-Four Thousand Seven Hundred Thirty-Nine Dollars and Seventy-Nine Cents ($24,739.79) in U.S. Currency from Huntington National Bank Account No. XXXXXXX8440;

4.  One Hundred Ninety-Two Thousand Four Hundred Thirty-Two Dollars and Ninety-Nine Cents ($192,432.99) in U.S. Currency From Chemical Bank Account No. XXXXXXX0154;

5.  Sixty-One Thousand Four Hundred Ninety-Four Dollars and Forty-One Cents ($61,494.41) in U.S. Currency from Michigan State Federal Credit Union Account No. XXXX47-20;

6.  Twenty Thousand Five Hundred Seventy-Three Dollars and Sixty Cents ($20,573.60) from Michigan State Federal Credit Union Account No. XXXX47-80;

7.  Fourteen Thousand Nine Hundred Three Dollars and Twenty-Five Cents ($14,903.25) in U.S. Currency from Michigan State University Federal Credit Union Account No. XXXX25-26;

8.  Funds on Deposit in Michigan State Federal Credit Union Account No. XXXX25-C0;

9.  Four Thousand Six Hundred Ninety-Eight Dollars and Five Cents ($4,698.05) in U.S. Currency From Michigan State Federal Credit Union Account No. XXXX25-86;

10. Funds on Deposit in Charles Schwab Account No. XXXX-0476 (previously TD Ameritrade Account No. XXX-XX2918);

11. Funds on Deposit in Vanguard Account No. XXXX9050;

12. Two Hundred Ninety-Four Thousand One Hundred Thirty-One Dollars and Fifty-Four Cents ($294,131.54) In U.S. Currency From Huntington National Bank Account No. XXXXXX0448;

13. Eleven Thousand Nine Hundred Forty-One Dollars and Forty Cents ($11,941.40) In U.S. Currency From Huntington National Bank Account No. XXXXXXX4140;

14. Nineteen Thousand Five Hundred Forty-Two Dollars and One Cent ($19,542.01) In U.S. Currency From Huntington National Bank Account No. XXXXXXX2338;

15. Twenty-One Thousand Four Hundred Fifty-One Dollars and Thirty Cents ($21,451.30) In U.S. Currency From United Financial Credit Union Account No. XXXX95-01;

16. Twenty-One Thousand Eight Hundred Forty-Four Dollars and Seventy-Seven Cents ($21,844.77) In U.S. Currency From United Financial Credit Union Account No. XXXX95-04;

17. Five Hundred Fifty-Six Thousand Seventy-Two Dollars and Ninety-Five Cents ($556,072.95) In U.S. Currency From Union Bank Account No. XXXXXX1625;

18. Funds on Deposit in SEI Private Trust Company Account No. XXX517;

19. Funds on Deposit in SEI Private Trust Company Account No. XXX528;

## AUTOMOBILE

20. One (1) 2016 Chevrolet Suburban Automobile, VIN Number: 1GNSKHKCXGR443780;

## REAL PROPERTY

21. 11400 Arland Road, Rives Junction, Jackson County, Michigan 49277 / Tax Parcel No.: 000-02-10-201-002-05;

22

22. 7261 Terry Street, Saginaw, Saginaw County, Michigan 48609 / Tax ID No.: 28-12-3-36-1022-002;

23. Buzzell Road, Gladwin, Gladwin County, Michigan 48624 / Tax Parcel No.: 26-100-003-300-004-10;

24. 211 W Park Street, Saint Johns, Clinton County, Michigan 48879 / Tax Parcel No.: 300-000-069-009-00;

25. 306 S. Ottawa, Saint Johns, Clinton County, Michigan 48879/ Tax Parcel No.: 300-400-000-016-00;

26. Westbrook Road, Ionia, Ionia County, Michigan 48846 / Tax Parcel No.: 150-024-000-015-00;

27. 5907 Olmstead Road, Muir, Ronald Twp., Ionia County, Michigan 48860 / Tax Parcel No.: 150-024-000-035-01;

28. 37 Arrowhead Drive, Pewamo, Ionia County, Michigan 48873 / Tax Parcel No.: 080-013-000-090-30;

29. 56 Arrowhead Drive, Pewamo, Ionia County, Michigan 48873 / Tax Parcel No.: 34-080-024-000-010-11 (Attached Parcels: 34-080-024-000-10-12, 34-080-013-000-090-80);

30. Arrowhead Drive, Pewamo, Ionia County, Michigan 48873 / Tax Parcel No.: 080-024-000-010-12;

31. Stoney Creek Road, Pewamo, Ionia County, Michigan 48873 / Tax Parcel No.: 080-013-000-090-20;

32. Struble Road, Muir, Ionia County, Michigan 48860 / Tax Parcel No.: 090-017-000-005-10;

33. Off Olmstead Road, Ionia, Ionia County, Michigan 48846 / Tax Parcel No.: 090-019-000-040-00;

34. 5610 Olmstead Road, Ionia, Ionia County, Michigan 48846 / Tax Parcel No.: 090-019-000-035-21;

35. Olmstead Road, Ionia, North Plains Twp., Ionia County, Michigan 48846 / Tax Parcel No.: 090-019-000-045-00;

36. Off Hogan Road, Ionia, Ionia County, Michigan 48846 / Tax Parcel No.: 090-019-000-025-22;

37. Olmstead Road, Ionia, North Plains Twp., Ionia County, Michigan 48846 / Tax Parcel No.: 090-019-000-005-33;

38. 1300 Lentner Road, Turner, Arenac County, Michigan 48765 / Tax Parcel No.: 011-0-021-200-015-00;

39. Off Turner Road, Turner, Bay County, Michigan 48765 / Tax Parcel No.: 011-0-011-400-005-00;

40. 791 M 61, Standish, Bay County, Michigan 48658 / Tax Parcel No.: 09-060-011-100-015-01;

41. 2150 W M-61, Bentley, Bay County, Michigan 48613 / Tax Parcel No.: 060-005-400-015-02;

42. Real property located at 4471 M 61, Standish, Arenac County, Michigan 48658 / Tax Parcel No.: 006-0-010-200-030-01;

43. 2138 South U.S. Highway 27, Saint Johns, Michigan 48879 /Tax Parcel No.: 030-021-100-005-51; and

44. 1000 – 1002 South U.S. Highway 127 BR, Saint Johns, Clinton County, Michigan 488791 / Tax Parcel No.: 19-300-410-000-007-00 and 19-300-410-000-006-00.

Forfeiture also includes the imposition of a personal forfeiture money

judgment against the defendants, in favor of the United States of America, in an

24

amount representing the gross proceeds obtained by the defendants as a result of

their violation of Count One through Fifteen of the Indictment.

If any of the property described above, as a result of any act or omission

of the defendants:

a.  cannot be located upon the exercise of due diligence;
b.  has been transferred or sold to, or deposited with, a third party;
c.  has been placed beyond the jurisdiction of the court;
d.  has been substantially diminished in value; or
e.  has been commingled with other property which cannot be divided
    without difficulty,

the United States of America shall be entitled to forfeiture of substitute property

pursuant to 21 U.S.C. § 853(p).

**THIS IS A TRUE BILL.**


s/ *Grand Jury Foreperson*
GRAND JURY FOREPERSON

DAWN N. ISON
United States Attorney


s/ *Mark Chasteen*
MARK CHASTEEN
Chief, White Collar Crime Unit
Assistant United States Attorney


s/ *Karen L. Reynolds*
KAREN L. REYNOLDS
Assistant United States Attorney

25

s/ T. Patrick Martin
T. PATRICK MARTIN
Assistant United States Attorney


s/ Gjon Juncaj
GJON JUNCAJ
Assistant United States Attorney

Date: September 25, 2024

| United States District Court<br>Eastern District of Michigan | Criminal Case Cover Sheet | Case Number<br>23-cr-20676 |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

| **Companion Case Information** | Companion Case Number: |
|---|---|
| This may be a companion case based upon **LCrR 57.10 (b)(4)**[1]: | Judge Assigned: |
| ☐ Yes ☒ No | AUSA's Initials: *KLR* |

**Case Title:** USA v. Jeffrey Bartlett, et al.

**County where offense occurred :** Arenac and Saginaw

**Check One:** ☒ Felony ☐ Misdemeanor ☐ Petty

____ Indictment/____ Information --- **no** prior complaint.
____ Indictment/____ Information --- based upon prior complaint [Case number: ]
__✓__ Indictment/____ Information --- based upon LCrR 57.10 (d) *[Complete Superseding section below]*.

## Superseding Case Information

**Superseding to Case No:** 23-cr-20676          **Judge:** Thomas L. Ludington

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☒ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|
| D-5 Anthony Thelen | 18 U.S.C. § 1349<br>18 U.S.C. § 371<br>18 U.S.C. § 1343 | |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

September 25, 2024
Date

*s/ Karen L. Reynolds*
Karen L. Reynolds
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226-3277
Phone:(313) 226-9672
E-Mail address: karen.reynolds@usdoj.gov
Attorney Bar #: P31029

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.