UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,                          Case No. 1:23-cr-20676

v.                                         Honorable Thomas L. Ludington
                                                      United States District Judge

JEFFREY BARTLETT, et al.,

              Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' DISCOVERY MOTIONS

In this criminal case involving an alleged conspiracy to commit wire fraud, conspiracy to defraud the United States, and thirteen separate counts of wire fraud, Defendant Brian Bartlett filed three motions seeking specific pretrial discovery disclosures from the Government. Defendants Jeffrey Bartlett, Adam Ball, and Andrew Semenchuk have joined all motions and seek the same relief.

First, Defendants seek the Government's disclosure of certain information related to anticipated expert witnesses under Federal Criminal Rules 12 and 16. But the Government, at this juncture, does not anticipate calling any expert witnesses at trial. Regardless, Defendants' requested disclosures far exceed those required by Rule 16, and Defendants' reliance on Rule 12 is misplaced. Second, Defendants seek the Government's pretrial disclosure of all "other acts" evidence it intends to offer under Federal Rule of Evidence 404(b). But Rule 404(b)(3) only requires the Government to provide reasonable *notice* of anticipated 404(b) evidence, and the Government has done so. Third, Defendants seek the Government's pretrial written proffer of all out-of-court statements it anticipates admitting at trial and requests an *Enright* hearing to determine the admissibility of these statements under Federal Rule of Evidence 801(d)(2)(E). But the

Government has largely already identified, through its pleadings and a recent three-hour reverse proffer, the coconspirator statements it anticipates introducing at trial. And, as routinely recognized by the Sixth Circuit, *Enright* hearings are uneconomic, burdensome, and time-consuming. Instead, an in line with the general preference in this Circuit, this Court will conditionally admit all out-of-court coconspirator statements at trial, subject to Defendants' continuing objection and the Government's proof of admissibility throughout its case in chief.   Accordingly, Defendants' discovery motions will be denied.

## I.

### A. Factual Background

Defendants Jeffrey Bartlett, Andrew Semenchuk, Adam Ball, Brian Bartlett, and Anthony Thelen are charged with conspiracy to commit wire fraud, 18 U.S.C. § 1349 (Count I); conspiracy to defraud the United States, 18 U.S.C. § 371 (Count II); and thirteen counts of wire fraud/aiding and abetting, 18 U.S.C. § 1342/18 U.S.C. § 2 (Counts III–XV). ECF No. 132. All charges stem from Defendants' alleged conduct involving Surveying Solutions Inc. (SSI)[1] and related companies, which the Government generally alleges defrauded the United States of hundreds of thousands of dollars through transportation contracts with the Michigan Department of Transportation (MDOT) from early 2011 through mid-2019. *See generally id.*

Defendants' alleged fraudulent conduct is best considered in three parts. First, on the front end, the Government alleges Defendants conspired to fraudulently obtain and maintain SSI's certification as a Disadvantaged Business Enterprise to obtain preferential status when bidding on

---

[1] SSI currently advertises itself as Michigan's "premier consulting firm," which specializes in "geospatial/surveying services." *About*, SSI, https://ssi-mi.com/about/ (last accessed Oct. 11, 2024) [https://perma.cc/T2TW-EQVV]. Across three Michigan offices in Standish, St. Johns, and Saginaw, SSI has nearly 120 employees, including professional surveyors, engineers, CAD technicians, and field crew members. *See id.*

transportation contracts with MDOT. *See id.* at PageID.1513–16. Second, once awarded a contract, the Government alleges Defendants fraudulently misrepresented SSI's overhead and labor costs to artificially inflate MDOT's reimbursement.[2] *Id.* at PageID.1516–20. Third, on the back end, the Government alleges Defendants orchestrated a scheme to equally split the ill-gotten gains at the end of each fiscal year for each Defendant's personal benefit. *Id.* at PageID.1520–22. Each part of Defendant's alleged fraudulent conduct will be discussed in turn.

### 1. Defendant's Alleged DBE Scheme

In 1983, the United States Department of Transportation (USDOT) created the Disadvantaged Business Enterprise (DBE) Program to "remedy ongoing discrimination and the continuing effects of past discrimination in federally-assisted highway, transit, airport, and highway safety financial assistance transportation contracting markets nationwide. The primary . . . objective of the DBE [P]rogram is to level the playing field by providing small businesses owned and controlled by socially and economically disadvantaged individuals a fair opportunity to compete for federally funded transportation contracts." *Disadvantaged Business Enterprise (DBE) Program*, U.S. DEP'T OF TRANSP. (last updated Nov. 25, 2022), https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise [https://perma.cc/LAA6-WW9U]. The DBE Program achieves this objective in part by certifying certain businesses as DBEs. Although USDOT largely delegates certification to state and local agencies, federal regulation explains that an entity may only be certified as a DBE if it is (1) a small business, as defined by the Small Business Administration's regulations; (2) independent; and (3) "at least 51% owned by a socially or economically disadvantaged individual[]." 49 C.F.R. §§ 26.65(a), 26.69(b), 26.71.

---

[2] As explained in the Second Superseding Indictment, approximately "80-90%" of the relevant contracts between SSI and MDOT were funded by the United States Department of Transportation through the Federal Highway Administration. ECF No. 132 at PageID.1508.

To determine whether a DBE applicant is sufficiently "independent," reviewers "scrutinize relationships with non-DBE firms, in such areas as personnel, facilities, equipment, [and] financial . . . resources" and "consider whether present . . . employer/employee relationships" between the owner of the potential DBE and personnel from non-DBE firms "compromise the independence of the potential DBE firm." 49 C.F.R. § 26.71(b). Turning to ownership, "women, Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, [and] Subcontinent Asian Americans" are presumably socially disadvantaged. 49 C.F.R. § 26.67(a)(1). And an individual owner is presumably economically disadvantaged if the owner's net worth is less than $1.32 million. 49 C.F.R. § 26.67(a)(2)(i), (b)(1)(i).

Certification is crucial because "the integrity of [the] DBE [P]rogram depends upon systematic procedures to ensure that only *bona fide* small firms, owned and controlled by socially and economically disadvantaged individual(s), are certified to participate as DBEs in DOT federally assisted programs." *Disadvantaged Business Enterprise (DBE) Program*, U.S. DEP'T OF TRANSP. (last updated Nov. 25, 2022), https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise (emphasis added) [https://perma.cc/LAA6-WW9U]. Indeed, certifying agencies "must deny [DBE] applications based on sham transactions or false representations, and . . . must decertify DBEs that engage in or make them." 49 C.F.R. § 26.69(g)(2). Importantly, once certified, DBEs may receive more contract opportunities because the DBE Program requires state and local transportation agencies that receive federal funding—like MDOT—to set goals to increase DBE participation in the transportation contracting industry. *See* 49 C.F.R. § 26.39.

SSI was a certified DBE before 2011, when SSI was owned by non-party Guy Spreeman. *See* ECF No. 37 at PageID.102; Opinion Letter from Sheryl G. Williams, Acting Associate Director, External Civil Rights Programs Division, U.S. Dept. of Transp., to Franklin

Adams, Manager, Business and Administrative Services Division, Mich. Dep't of Transp. (July 2 7, 2015), https://www.transportation.gov/sites/dot.gov/files/14-0071-Surveying%20Solutions%2 C%20Inc.pdf [https://perma.cc/SU3Z-VUBV] [hereinafter USDOT Letter]. But Spreeman passed away in January 2011, and majority ownership of SSI "passed by default" to Defendant Jeffrey Bartlett. *Id.* Because Defendant Jeffrey Bartlett was a "non-disadvantaged individual," "MDOT removed SSI's DBE certification in July 2011." *Id.*

On February 25, 2011—just after Defendant Jeffrey Bartlett acquired control of SSI—the Government alleges that all Defendants entered into a written "Secret Agreement" that provided that all Defendants would be equal owners of the "SSI Group"—a group of companies including (1) SSI, (2) Southfield IT, (3) 2SI Development, LLC ("2SI"), (4) 3SI Building and Leasing, LLC ("3SI"); and (5) Geo Precision Services, LLC ("Geo"). *See* ECF No. 132 at PageID.1511, 1514, 1520. This Secret Agreement read as follows:

> It is the intent of this agreement that the Buyers and Sellers will each own a *20 percent undivided interest in the above named companies* at the completion of the "Buy In" period. Regardless of how the Articles of Incorporation, Stock, Ownership, By Laws, etc. are written/retained; the intent is for all 5 parties to have *equal ownership of the companies* at the completion of the "Buy In" period.

*Id.* at PageID.1514 (emphasis added). Defendants Brian Bartlett, Jeffrey Bartlett, and Anthony Thelen signed this agreement as the "Sellers," while Defendants Adam Ball and Andrew Semenchuk signed as the "Buyers."[3] *Id.* at PageID.1515.

---

[3] Less than two months after signing the alleged 2011 Secret Agreement, Defendant Brian Bartlett emailed Defendants Jeffrey Bartlett, Adam Ball, Anthony Thelen, and Andrew Semenchuk with the suggestion that all Defendants "sit down" and come up with a "better structure to the [SSI Group] org chart" so they could "easi[ly] keep [their] stories straight" when discussing the entities. ECF No. 113-2 at PageID.1138 (sealed). After Defendant Jeffrey Bartlett responded, Defendant Brian Bartlett replied to all Defendants, highlighting the need to "keep all of [their] lies straight so [they] don't look like idiots." *Id.* at PageID.1142.

On June 2, 2011, shortly after signing the alleged 2011 Secret Agreement, Defendant Semenchuk—an Asian Pacific Islander and the purported sole owner of Geo—applied to certify Geo as a DBE. *See id.* at PageID.1511, 1513. Geo became DBE certified soon after. *See* USDOT Letter, pg. 2. One year later, in June 2012, Geo purchased 51% of SSI and became its majority owner. *Id.*; *see also* ECF No. 37 at PageID.106–07. In October 2012, "MDOT revoked Geo's DBE status because, after purchasing control of SSI, "Geo was no longer [an] independent business." USDOT Letter, pg. 2. Defendant Semenchuk then dissolved Geo, transferred Geo's assets to SSI, and operated "solely under SSI's name[] because [SSI] had better name recognition and a more established credit history." *Id.* So, by December 2012, Semenchuk—rather than Geo as an entity—was SSI's purported majority owner. *Id.* But the Government cites Defendants' 2011 Secret Agreement and alleges that Semenchuk, in reality, only owned a 20% share of SSI equal to all other Defendants, and "never had ultimate managerial control[.]" ECF No. 132 at PageID.1514.

On April 19, 2013, Semenchuk applied to certify SSI as a DBE. ECF No. 132 at PageID.1524. But MDOT denied the application for three main reasons. USDOT Letter, pg. 2–3. First, MDOT concluded that SSI was insufficiently independent because (1) it leased two of its three offices from 3SI, and (2) leased surveying equipment and cars from 2SI when 2SI was partially owned by SSI executives Defendants Brian Bartlett and Anthony Thelen. *See id.* When pressed for more information, Semenchuk told MDOT officials—contrary to the 2011 Secret Agreement—that "neither he nor any owners of SSI possessed *any* ownership interest in" 2SI or 3SI, and that all were "totally separate and distinct entities." *Id.* (emphasis added). But, when MDOT requested tax returns or outside lease agreements to corroborate these claims, Semenchuk refused to comply. *Id.* Second, MDOT "concluded that SSI could not prove by clear and convincing evidence that the transfer of ownership [to Semenchuk] occurred for reasons other than

obtaining DBE certification[.]" *Id.*, pg. 5. Third, MDOT concluded that Defendant Semenchuk had not proven he controlled SSI. *Id.* at pg. 5–6. Indeed, MDOT noted that SSI may have actually been controlled by Defendant Jeffrey Bartlett, an experienced surveyor who owned SSI just before Semenchuk and Geo's purchase, and owned 48% of SSI after this purchase. *See id.*, pg. 6.

On July 27, 2015, the USDOT ultimately reversed MDOT's decision and directed MDOT to certify SSI as a DBE "without delay[.]" *Id.*, pg. 7; ECF No. 132 at PageID.1516. The USDOT found "nothing in the record"[4] to suggest Defendant Brian Bartlett and Anthony Thelen's dual-status as SSI employees and owners of 2SI and 3SI compromised SSI's independence. USDOT Letter, pg. 4. Although "70% of SSI's business account payments (excluding personnel costs) were paid to [2SI and 3SI], the evidence in the record indicate[d] that the transactions between SSI and 2SI/3SI were arms-length transactions." *Id.* USDOT disagreed with MDOT's conclusion that Defendant Semenchuk purchased SSI solely to obtain SSI's DBE certification because, "in [his] words, he purchased SSI because he 'wanted to expand [Geo], eliminate competition, and . . . make a profit.'" *Id.*, pg. 6. Although Defendant Jeffrey Bartlett owned 48% of SSI and was an experienced surveyor, the USDOT found no evidence that he had "the power or authority to control" SSI after Defendant Semenchuk's purchase. *Id.*

On August 28, 2014, seemingly in celebration of SSI's DBE certification, Defendant Jeffrey Bartlett sent Defendants Brian Bartlett, Adam Ball, Andrew Semenchuk, and Anthony Thelen the following email:

> Not bad for a bunch of white guys trying to be a minority-owned business . . . And we will be billing the FUCK out of August thru November for sure.

---

[4] The "record" the USDOT reviewed in 2015 is not the same as the evidentiary record currently before the Court. Indeed, it is unclear whether USDOT's 2015 administrative investigation considered the evidence uncovered throughout the Government's criminal investigation in 2019, including Defendants' alleged 2011 Secret Agreement.

ECF No. 132 at PageID.1516 (emphasis in original).

Defendant Semenchuk submitted annual "No Change Affidavits" to MDOT to maintain SSI's DBE certification in July of 2016, 2017, and 2018. *Id.* at PageID.1515. Through these affidavits, Semenchuk affirmed that he—a "socially disadvantaged" individual—was still SSI's majority owner. *See* 49 C.F.R. § 26.83(j). The Government alleges these representations were fraudulent because, per the 2011 Secret Agreement, Semenchuk was not SSI's majority owner and, like all other Defendants, only owned a 20% share of the SSI Group. ECF No. 132 at PageID.1515.

At bottom, the Government characterizes Defendants' alleged DBE misrepresentations and omissions as an *object* of Defendants' conspiracy to defraud the United States, charged in Count II of the Second Superseding Indictment.[5] *See* ECF No. 132 at PageID.1523.

### 2. Defendants' Alleged Overbilling Scheme

The Government also alleges that, after MDOT awarded SSI various transportation contracts, Defendants artificially created and inflated costs subject to MDOT reimbursement through a series of misrepresentations about SSI's relationship with the other SSI Group companies and its own employees. *See id.* at PageID.1516–22.

Before turning to Defendants' alleged overbilling, it is necessary to explain how MDOT paid SSI on each awarded contract. According to the Government, MDOT paid SSI by multiplying SSI's "direct labor costs" by an "indirect overhead rate" and then applying a fixed 11% incentive fee, intended to provide SSI with a profit. *See id.* at PageID.1509–10. SSI's "direct labor costs"

---

[5] Accordingly, the Government need not necessarily prove at trial that SSI's DBE status actually increased the amount of contracts MDOT awarded to SSI. *See United States v. Thompson*, 366 F.2d 167, 171 (6th Cir.1966) ("Success in defrauding the United States is not an element of [18 U.S.C. § 371], nor is it required that the government actually have been cheated out of money or property." (internal quotations omitted)) *accord United States v. Ferguson*, 844 F. Supp. 2d 810, 819 (E.D. Mich. 2012).

were calculated on a contract-by-contract basis, by considering the number of SSI employees who worked on a contract, the number of hours each employee worked, and each employee's hourly rate. *See* ECF No. 132 at PageID.1509. SSI's "indirect overhead rate," on the other hand, was calculated through an annual "pre-qualification process" which considered SSI's expenses during the prior fiscal year. *See id.* Generally, contractors may include rental costs in purported overhead expenses, subject to reimbursement. *See* 48 C.F.R. § 31.205-36. But, critical to the Government's case, if the contractor rents real or personal property from a *commonly controlled entity*, federal regulations prohibit the contractor from including these costs. Instead, contractors renting from commonly controlled entities can only include—as part of their reimbursable overhead rate—the *normal costs of ownership*, such as "depreciation, taxes . . . and maintenance" for the specific piece of rented property. 48 C.F.R. § 31.205–36(b)(3); *see also* ECF No. 132 at PageID.1518.

Ultimately, to pay and reimburse SSI for awarded contracts, MDOT wired funds from its Comerica Bank account in Michigan to SSI's Huntington National Bank account in Ohio. ECF No. 132 at PageID.1522. And the Government has identified thirteen wire transfers from MDOT to SSI throughout 2018 and 2019. *See id.* at PageID.1525–27. Accordingly, as alleged, Defendants' overbilling is *both* an object of their conspiracy to defraud the United States (Count II) *and* forms the factual basis for thirteen separate counts of wire fraud (Counts III—XV). *See id.* at PageID.1512–13, 1525–27.

With this context in mind, the Government alleges Defendants defrauded MDOT through two separate schemes flush with fraudulent misrepresentations and omissions. *See* ECF No. 132 at PageID.1523. The first concerned SSI's relationship to other companies. *Id.* The second concerned SSI's relationship to its own employees. *Id.*

- 9 -

### a.   Costs Attributable to Commonly Controlled SSI Group Companies

First, the Government alleges that, despite Defendants' 2011 Secret Agreement and other evidence indicative of common control, Defendants fraudulently represented that the other SSI Group companies—2SI, 3SI, and Southfield IT—were independent such that Defendants could charge MDOT artificially-inflated prices for fictitious rental "costs." *See id.* at PageID.1516–19. As alleged, each SSI Group company had a distinct role to play.

2SI was SSI's equipment supplier. According to the Second Superseding Indictment, SSI rented surveying equipment and company cars from 2SI and sought MDOT's reimbursement for these rental costs in full because Defendants represented that 2SI was independent from SSI. *See* ECF No. 132 at PageID.1517–18. But all Defendants signed the 2011 Secret Agreement, providing that 2SI and SSI were equally owned by all five Defendants. ECF No. 132 at PageID.1514. According to investigating agents, "2SI was organized in 2004 by [Defendant] Brian Bartlett." ECF No. 88-1 at PageID.471 (sealed). At all relevant times, Defendant Jeffrey Bartlett was held out as 2SI's owner, and he, Defendant Brian Bartlett, and Defendant Anthony Thelen were authorized signatories on 2SI's bank account. *Id.* Moreover, 2SI's registered agent was SSI's certified public accountant. *Id.* at PageID.472. And, from January 2016 through February 2019, 99.2% of 2SI's funding came from SSI. *Id.* at PageID.478. Ultimately, by fraudulently misrepresenting SSI's relationship to 2SI, MDOT auditors estimated that Defendants overbilled MDOT by nearly $6,000,000 from 2016 through 2018 throughout inflated rental costs.[6] *See id.* at PageID.475–76.

---

[6] For specific examples of Defendants' alleged overbilling involving mobile scanners and company cars SSI "rented" from 2SI, *see United States v. Bartlett*, 2024 WL 4533554, at *5–6 (E.D. Mich. Oct. 21, 2024).

3SI served as SSI's landlord. Defendants Brian Bartlett, Jeffrey Bartlett, and Anthony Thelen co-founded 3SI in 2009 and were, at all relevant times, authorized signatories on 3SI's bank account. *Id.* at PageID.468. From January 2016 through February 2018, 99.8% of the deposits to 3SI's bank account "were from accounts controlled by SSI or 2SI[.]" *Id.* at PageID.478. Yet the Government alleges Defendants "agreed to and did submit fraudulent claims to MDOT for rent[al] payments from SSI to 3SI, [hiding] from MDOT the fact that SSI and 3SI" were commonly controlled. ECF No. 132 at PageID.1519. Had Defendants disclosed that SSI and 3SI were commonly controlled, the Government alleges, they would have only received MDOT's reimbursement for the "normal costs of ownership" (taxes, depreciation, maintenance). *Id.* But the Government alleges SSI billed MDOT for the full amount SSI paid 3SI to rent office space in Standish and St John's, Michigan.[7] *See* ECF No. 88-1 at PageID.468–69 (sealed). In total, MDOT auditors estimate that, from 2016 through 2018,  SSI overbilled MDOT by $518,550.58 for its rental costs to 3SI. *Id.* at PageID.471.

Lastly, Southfield IT was, as its name suggests, SSI's IT provider.[8] Southfield IT was founded by Defendant Ball. *Id.* at PageID.463. Southfield IT's P.O. Box was allegedly obtained by SSI office manager Courtney Stodolak. *Id.* at PageID.464; *see also United States v. Bartlett*, No. 1:23-CR-20676, 2024 WL 1715397, at *3 (E.D. Mich. Apr. 22, 2024) (noting Stodolak was "the longest-serving SSI employee" and attempted to—but did not—purchase majority ownership of

---

[7] For example, in 2017, SSI paid 3SI *$217,720* to rent its Standish Headquarters and was reimbursed by MDOT accordingly. *See* ECF No. 88-1 at PageID.469 (sealed). But the FBI estimated "the normal cost of ownership" for this building in 2017 was just over *$20,538. Id.* (noting the building had a "conservative" initial value of $450,000 such that, considering a 39-year useful life, annual depreciation would total $11,538 and annual taxes would total $9,000).

[8] Southfield IT was the registered trade name for National Elevation Certificates, LLC ("NEC"). *See* ECF Nos. 132 at PageID.1510; 88-1 at PageID.463 (sealed). Although some portions of the record refer to Southfield IT as "NEC," this Opinion and Order will use only the former for consistency.

SSI when Spreeman passed away in 2011). In February 2015, Southfield IT opened a bank account and listed Defendant Ball as one of its signatories. ECF No. 132 at PageID.1517. Other signatories included Defendants Thelen and Brian Bartlett. ECF No. 88-1 at PageID.465 (sealed). Once Southfield IT's bank account was opened, the Government alleges 99.2% of its funds were furnished through SSI and that 95.9% of these funds were "ultimately transferred back" to Defendants and their spouses. ECF No. 132 at PageID.1517; *see also* ECF No. 88-1 at PageID.465 (sealed). Despite this evidence of common control, the Government alleges Defendants represented to MDOT that Southfield IT was independent from SSI, and created "fictitious contracts and invoices" between the two companies to "fraudulently inflate their overhead costs which were then reimbursed by MDOT." [9] ECF No. 132 at PageID.1516. MDOT estimates that, from 2016 through 2018, it overpaid SSI nearly $2,000,000 as a result of Defendants' fraudulent representations regarding IT expenditures. ECF No. 88-1 at PageID.467 (sealed).

Notably, the Government has also uncovered evidence suggesting Southfield IT was not SSI's actual IT provider. Investigating FBI agents interviewed "Individual A," the owner of Network Services Group (NSG). *Id.* at PageID.466. Individual A informed the FBI that NSG— rather than Southfield IT—provided SSI with IT services beginning in 2009. *Id.* But, in December 2014, Defendant Semenchuk sent Defendants Adam Ball, Brian Bartlett, and Jeffrey Bartlett an email entitled "SSI IT Company," which noted all Defendants discussed "forming an IT company for OH reasons"[10] and suggested "all of [NSG']s bills [could] go to this new company" such that

---

[9] For example, SSI billed MDOT a total of *$1,575,304.30* for IT services it received from Southfield IT throughout FY 2015, 2016, and 2017. ECF No. 88-1 at PageID.463 (sealed). But the FBI concluded that SSI actually spent "less than *$145,184.73* on IT services . . . from January 2016 through February 2019." *Id.* (emphasis added).

[10] The Government seemingly alleges that "OH" referred to SSI's reimbursable overhead rate. *See* ECF No. 113-1 at PageID.974–75.

the expenses could "be marked up before [being] sent to SSI." ECF No. 113-1 at PageID.1007 (sealed). In accordance with these emails, Individual A reported that, in early 2016, Defendant Semenchuk "began directing [him] to re-issue certain SSI invoices to Southfield IT," such that he "understood that NSG's work always supported SSI regardless of [whether] it was billed to SSI or Southfield IT[.]" ECF No. 88-1 at PageID.467 (sealed).

### b.  Direct Labor Costs and Payroll Representations

In addition to fraudulently misrepresenting SSI's relationship to 2SI, 3SI, and Southfield IT to artificially inflate SSI's reimbursable *overhead rate*, the Government alleges Defendants artificially inflated SSIs reimbursable *direct labor costs* by billing MDOT for the work of "ghost employees," including their spouses. ECF No. 132 at PageID.1510, 1519–20.

On September 25, 2015, Defendant Jeffrey Bartlett sent Defendants Brian Bartlett, Anthony Thelen, Adam Ball, and Andrew Semenchuk an email entitled "Our Hours," which stated the Defendants would "have a tough time billing out projects if [they] d[id] not have more time to put on them that is *semi-legitimate*." ECF No. 113-2 at PageID.1352 (sealed) (emphasis added). In addition to suggesting Defendants "come up with additional scanner charges" from 2SI, Defendant Ball asked the group whether Defendants could "raise hours/wages for [their] wives." *Id.* Defendant Jeffrey Bartlett responded that Defendants "may have to give [their wives] bigger raises to *help out on overhead*[.]" *Id.* (emphasis added). And, in May 2016, Defendant Semenchuk emailed all Defendants suggesting they represent to MDOT that their wives "performed marketing duties" because Defendants gave their wives "large bonuses" which "need[ed] to [be] justif[ied]." ECF No. 113-3 at PageID.1387.

In accordance with these emails, SSI's 2017 payroll identified that four of the five Defendants' spouses—Sarah Ball, Jenny Bartlett, Celena Thelen, and Jessica Bartlett—worked on

various MDOT contracts as "project assistants." ECF No. 88-1 at PageID.480 (sealed). But MDOT auditors concluded that "none" of these spouses assisted on projects. *Id.* The FBI's investigation reached the same conclusion.[11] *See id.* Yet, Defendants' spouses were among the highest-paid "employees" at SSI, and received hundreds of thousands of dollars in annual bonuses. *Id.* In FY 2017 alone, SSI included $130,156 in its reimbursable direct labor costs to compensate Defendants' spouses. *Id.* Ultimately, MDOT estimates that, from 2016 through 2018, it overpaid SSI approximately $850,360.14 as a result of Defendants' alleged fraudulent payroll misrepresentations. *Id.*

### 3.  Defendants' Alleged Equalization Scheme

The Government alleges Defendants *personally* benefited from the fruits of their alleged fraudulent overbilling labor by "equalizing" the income of all SSI Group companies, such that each Defendant received, pursuant to the 2011 Secret Agreement, their 20% share of the Groups' net income at the end of each fiscal year. ECF No. 132 at PageID.1520–22. To do so, the Government alleges Defendants would offer fictitious "loans" to one another and take fake loans from the SSI Group entities, with the expectation that the loans would never be paid.[12] *Id.*

---

[11] The FBI concluded that the timesheets Defendants provided MDOT to corroborate their wives' work contained "differing signatures," and noted, separately, that two of Defendants' spouses had other full-time jobs. ECF No. 88-1 at PageID.481 (sealed).

[12] Evidence also suggests Defendants used fake "loans" to keep their "books clean" and avoid administrative or criminal investigation. In October 2016, SSI's office manager emailed all Defendants with a "breakdown" of SSI, 2SI, 3SI, and Southfield IT's bank accounts. ECF No. 113-1 at PageID.1032 (sealed). Defendant Ball responded, "[s]hould we take some out of [SSI's] account again? Probably a little risky keeping that much in there[.]" *Id.* Defendant Semenchuk replied:

> I think what we should do, is make a payment to 2SI for some days []of scanner use [s]o Brian [Bartlett] and [Anthony Thelen] [c]an take their loans/distributions from 2[SI] and do an IT payment as well (for Adam [Ball]) to [Southfield IT].

For example, in December 2015, Sandy Slominski, a CPA with "Folds & Co., P.C. Certified Public Accounts" wrote a memo to Defendant Semenchuk and SSI entitled "2015 Year End Tax Planning" which outlined a "list" of the following "actions to take before the end of the year:"

1. Have SSI take out a loan of $600,000 from the line of credit.
2. Write a check from SSI to 2SI for $438,000
3. Write a check from SSI to [Southfield IT] for $411,110.95
4. Pay bonuses to SSI managers (see attached schedule). Gross bonus amount equals $765,197.00.
5. Write two checks for $205,000 from 2SI—one each to [Defendant Anthony Thelen] and [Defendant Brian Bartlett] for distributions.
6. Write a check from [Southfield IT] to [Defendant] Adam [Ball] for $288,000 for distributions.
7. Write a check for $130,000 to [Defendant] Jeff Bartlett from 2SI as a loan.
8. Write a check for $133,000 to [Defendant] Andy Semenchuk from [Southfield IT] as a loan.

ECF No. 113-1 at PageID.1023 (sealed). And CPA Slominski emphasized "[t]he important point is that each of your 'cash after tax' are close to equal.'" *Id.*

The Second Superseding Indictment also alleges that, on December 28, 2017, Defendant Jeffrey Bartlett sent an email to "SSI's accountant" titled "SSI Equalization[]" stating:

I guess I personally was thinking more on the lines of getting "loans" from SSI in the 2017 year *that we know would never be paid back* and keep us all equal from year to year.

ECF No. 132 at PageID.1521 (emphasis added). Three minutes later, Semenchuk sent Ball, Thelen, and Brian Bartlett an email titled "Update & Question" stating:

---

This method keeps the SSI books clean. Jeff [Bartlett] and I will take loans from SSI. At the end of the year, Jeff and I will have to pay our loans back . . . [a]nd then [can] take the loans from 2SI/[Southfield IT] like we did last year.

I know it is complicated and paranoia, but [] stay with the flow (clean books) . . .

Or just all take loans from SSI and sort it out later…

*Id.* at PageID.1031.

> [E]xactly bonuses to keep me under $350 and the rest *loans that will never be paid back*.[]

*Id.* (emphasis added). Five minutes later, Ball responded:

> I thought there was some discussion of doing the loans 1/1/2018 so that 2017 did not show monster loans on the books to the owners for DBE.

*Id.* Nine minutes later, Brian Bartlett responded:

> I thought the 2018 loans were for if we received a bunch more money and were not able to divert it to 2SI and [Southfield IT] because they are maxed out. Then we would do so after the first of the year for Adam [Ball], Brian [Bartlett], [Anthony Thelen] and Jeff [Bartlett]. Andy [Semenchuk] would get loans from SSI then . . .

*Id*. at PageID.1522.

### B. Procedural Posture

Trial is currently scheduled to begin in March 2025. ECF No. 131. On July 23, 2024, Defendant Brian Bartlett filed three pretrial discovery motions seeking (1) the Government's disclosure of expert-witness information pursuant to Federal Criminal Rules 12 and 16, ECF No. 89; (2) the Government's disclosure of anticipated "other acts" evidence under Federal Rule of Evidence 404(b), ECF No. 90; and (3) the Government's written proffer of anticipated out-of-court coconspirator statements, and a pretrial *Enright* hearing to decide the admissibility of these statements under Federal Rule of Evidence 801(d)(2)(E), ECF No. 91. Defendants Jeffrey Bartlett, Adam Ball, and Andrew Semenchuk joined all motions and seek the same relief. ECF Nos. 93; 94; 95; 101; 102; 105; 128. Each motion will be addressed in turn.

### II. Defendants' Motion for Expert Disclosures

Defendants' first motion lies at the intersection of two rules of Federal Criminal Procedure. Citing both Rules 16 and 12, Defendants seek an order directing the Government to disclose, at least 90 days before trial:

1.  All experts that they intend to use at trial;

- 16 -

2. All discovery in which these experts will use in formulating their opinions;
3. A detailed written synopsis from each expert discussing their proposed testimony and basis and reasons underling their opinions;
4. The names and case numbers of all prior matters in which they have either testified or offered expert opinions;
5. A detailed list of the literature, regulatory schemes, prior bidding agreements, and any other written documentation used in formulating their opinions;
6. Any additional evidence not previously provided which their expert witnesses will rely on; and
7. A list citing the specific evidence which its experts will rely on at trial and in the formulation of their opinions.

ECF No. 89 at PageID.628. But the disclosures Defendants seek far exceed the requirements of Rule 16, and Defendants' reliance on Rule 12 is misplaced.

Federal Rule of Criminal Procedure 16 governs discovery. If the Government "intends" to call an expert witness at trial, Rule 16(a)(1)(G) specifically requires the Government to disclose the following upon a defendant's request:

- a complete statement of all opinions that the government will elicit from the witness in its case-in-chief, or during [] rebuttal . . . ;
- the bases and reasons for them;
- the witness's qualifications, including a list of all publications authored in the previous 10 years; and
- a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition.

FED. R. CRIM. P. 16(a)(1)(G)(i), (iii). And the Court must, "by order or local rule," schedule the Government's disclosure at a time "sufficiently before trial to provide a fair opportunity for the defendant" to respond and prepare. FED. R. CRIM. P. 16(a)(1)(G)(ii).

But the Government does not intend to call any experts at trial. ECF No. 109 at PageID.912. Although the Government anticipates calling "two to three" MDOT auditors, the Government maintains their testimony will be "limited in scope" to their "roles in discovering Defendants' fraud" and background "facts and knowledge about the MDOT DBE program[;] government contracting regulations, rules, policies, and procedures[;] and how [these regulations and rules]

apply to the facts of this case." *Id.* at PageID.911–12. Accordingly, the Government maintains no Rule 16 disclosures are necessary because these MDOT auditors will testify as lay—rather than expert—witnesses. *Id.* The Government's contention has some merit. The "interpretation of federal regulations"—like those governing the DBE Program and government contract reimbursement—is "a question of law for the Court; not a question of interpretation for experts or a question of fact to be resolved by the jury." *Nemir v. Mitsubishi Motors Corp.*, No. 96-75380, 2006 WL 322476, at *1 (E.D. Mich. Feb. 10, 2006); *see also Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994); *Kettering Adventist Healthcare v. Jade Designs, LLC*, 677 F. Supp. 3d 735, 747 (S.D. Ohio 2023) ("[T]he interpretation of the applicability of federal regulations is not a matter for expert testimony or a question of fact for resolution by a jury."). Yet, in an "abundance of caution," the Government has averred it will "nonetheless provide" Defendants with all required Rule 16 notice and disclosures regarding these MDOT auditors "within 30 days of trial." ECF No. 109 at PageID.913. Rule 16 requires nothing more. Indeed, the seven specific disclosures Defendants seek—including "all discovery," which the Government's anticipated experts may hypothetically rely on when forming their opinions—are far broader than the four narrow disclosures contemplated by Rule 16. *Compare* ECF No. 89 at PageID.629 *with* FED. R. CRIM. P. 16(a)(1)(G)(ii).

Defendants then turn to Criminal Rule 12, to no avail. Rule 12 governs criminal pretrial motion practice, and Rule 12(b)(4)(B) specifically provides that "[a]t the arraignment or as soon afterward as practicable, the defendant may, *in order to have an opportunity to suppress evidence.* . . . request notice of the [G]overnment's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16." FED. R. CRIM. P. 12(b)(4)(B) (emphasis added) (parenthetical in original). By its own terms, Rule 12(b)(4) limits the

Government's notice of disclosure to (1) "evidence the defendant would be entitled to discover under Rule 16," (2) "evidence the government intends to use in its case in chief," and (3) evidence necessary to prepare for an "actual or potential motion[] to suppress[.]" *United States v. Bennett*, No. 3:07-CR-81, 2008 WL 701644, at \*3 (E.D. Tenn. Mar. 13, 2008), *aff'd*, 439 F. App'x 501 (6th Cir. 2011). Accordingly and importantly, "Rule 12(b)(4)(B) is *not* designed, nor intended, to be used to obtain more specific discovery than that provided by Rule 16. Rather, Rule 12(b)(4)(B) is intended to facilitate the making of *pretrial suppression motions* by allowing the defendant to avoid filing a motion to suppress when the government does not intend to use the evidence." *Id.* But Defendants filed a motion to suppress before filing the instant motion for Rule 12 and 16 disclosures, *see* ECF No. 88 (sealed), and this Court already denied suppression. *See* ECF No. 149. Rule 12 does not require nor support Defendants' requested disclosures.

For these reasons, Defendants' Motion "Requesting the Government Proffer Certain Information Required by . . . Rules 12 and 16" will be denied.[13] To the extent the Government

---

[13] As an aside, Defendants have routinely mischaracterized the Government's discovery efforts and disclosures. Throughout numerous pleadings, including the three motions addressed in this Opinion and Order, Defendants have chided the Government for providing a plethora of discovery with no guideposts. *See, e.g.*, ECF Nos. 110 at PageID.921 (alleging the Government's disclosure lacked "coherent chronological order, logical structure, and proper indexing"); 89 at PageID.633 (characterizing the Government's disclosure as a massive "open file" which insufficiently appraises Defendants about the key evidence the Government will rely on at trial); 90 at PageID.639 (describing the Government's production as a "double-digit . . . behemoth" yet suggesting Defendants "do[] not know what acts the Government wishes to attempt to present at trial"). But the Government has provided at least *three* reverse proffers to all Defendants and their Counsel, two of which were provided before the first indictment was filed in December 2023. ECF No. 112 at PageID.696. The most recent reverse proffer, in June 2024, involved a three-hour PowerPoint presentation which identified the evidence the Government considers critical to its case, and presented this evidence in largely chronological order, categorizing this evidence by specific subject matter. ECF Nos. 113-1 (sealed); 113-2 (sealed); 113-3 (sealed); *see also United States v. Bartlett*, No. 1:23-CR-20676, 2024 WL 1715397, at \*7 (E.D. Mich. Apr. 22, 2024) (commending the Government's significant discovery efforts).

anticipates calling expert witnesses at trial—including the "two to three" MDOT auditors—it will be directed to provide Rule 16 notice and disclosures at least thirty days before trial.

### III. Defendants' Motion for Rule 404(b) Disclosures

Next, Defendants seek "pretrial disclosure of all evidence which the Government intends to offer pursuant to" Federal Rule of Evidence 404(b). ECF No. 90 at PageID.635 (emphasis omitted). Defendants suggest that evidence obtained through discovery makes "repeated references to happenings that took place" before the alleged conspiracy began in 2011. *Id.* at PageID.639 (noting "there appears to be the potential of hundreds of thousands of instances of evidence that would fall into the category of" prior wrongful acts under Rule 404(b)). So, Defendants seek the Government's disclosure of the following information at least sixty days before trial:

1. A description of the other crime, wrong, or act the Government intends to offer. The description should include:
   A. The date or dates on which the other crime, wrong, or act allegedly occurred;
   B. The place or places at which such crime, wrong, or act occurred
2. The names and addresses of all persons who were witnesses to or have knowledge of such crime, wrong, or act.
3. Copies of all documents, materials, or other tangible objects which the Government intends to offer into evidence in conjunction with such FRE 404(b) evidence.
4. All evidence which is exculpatory within the purview *of Brady v Maryland*, 373 US 83 (1963), with regard to such other crimes, wrongs, or acts evidence, i.e., all evidence which detracts from the probative value of such evidence, or which indicates that the probative value of the evidence might be outweighed by its prejudicial effect.
5. A statement of the purpose for which such evidence is offered, i.e., a declaration from the Government of whether the evidence is being offered to show motive, opportunity, intent, etc. *See[] United States v Barnes*, 49 F3d 1144, 1148-[]49 (6th Cir. 1995) (disclosure should fairly appraise the defendant and be sufficiently clear to determine admissibility before trial).

*Id.* at PageID.639–40 (citations in original).

## A.

Federal Rule of Evidence 404(b) provides that "evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). In other words, a party cannot introduce another's prior bad acts solely to show propensity—that the party acted *in accordance* with these prior bad acts on a particular occasion. And for good reason—propensity reasoning "tends to distract the trier of fact from the main question of what actually happened on the particular occasion" and may prejudicially "permit[] the trier of fact to . . . punish the bad man because of their respective character[,] despite what the evidence in the case shows actually happened." FED. R. EVID. 404 advisory committee's note on proposed rules.

But prior bad acts *are admissible* if introduced for a non-propensity purpose. *See* Fed. R. EVID. 404(b)(2). While Rule 404(b)(2) expressly lists "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" as admissible non-propensity purposes, *id.*, this list "is illustrative, not conclusive." *Victor v. Reynolds*, No. 1:20-CV-13218, 2024 WL 811515, at *13 (E.D. Mich. Feb. 27, 2024). Any non-propensity purpose will do. *Id.* (citing *U.S. v. Knox*, 17 F. App'x 353, 356 (6th Cir. 2001); *United States v. Stout*, 509 F.3d 796, 799 (6th Cir. 2007)).

In criminal cases, the Government "must" provide reasonable notice of any prior wrongful acts evidence it intends to offer at trial, "so that the defendant has a fair opportunity to meet it." FED R. EVID. 404(b)(3)(A). In this notice, the Government must "articulate . . . the permitted purpose" it intends to offer the evidence for at trial, and must explain "the reasoning that supports" this purpose. FED. R. EVID. 404(b)(3)(B). The Government must provide this notice either "in

writing before trial" or "in any form during trial if the court, for good cause, excuses lack of pretrial

notice." FED. R. EVID. 404(b)(3)(C).

> (A) Articulate in the notice the permitted purpose for which [it] intends to offer the evidence and the reasoning that supports the purpose; and
> (B) Do so in writing before trial—or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

FED. R. EVID. 404(b)(3).

## B.

With this context in mind, the Government responds that, at this juncture, it "does not

intend to offer other acts evidence under Rule 404(b)" at trial. ECF No. 107 at PageID.859.

Defendants' motion could be denied on this ground alone.  But the Government notes its "decision

could change" because Defendants have not "articulated any kind of defense they might offer" at

trial, and have not provided reciprocal discovery. *Id.* at PageID.859–60. Regardless, "[t]o ensure

[Defendants have] adequate notice about the government's position on the admissibility of

evidence relating to events that happened prior to 2011," and to the extent the Government seeks

to introduce such evidence at trial, the Government dedicates nearly ten pages of its response to

notifying Defendants of specific "wrongful acts" evidence the Government *may* introduce at trial

*if prompted by* defenses or reciprocal discovery, and explaining how these wrongful acts, if

introduced at trial, would serve admissible non-propensity purposes. *See* ECF No. 107 at

PageID.861–71.

First, the Government identifies *another* secret agreement signed by Defendants Jeffrey

Bartlett, Brian Bartlett, and nonparty Guy Spreeman on October 15, 2011, which—like the alleged

2011 Secret Agreement—provided that all three would "ultimately be equal shareholders/owners"

of SSI, even though Spreeman was held out as SSI's 51% owner for DBE certification purposes.

*See* ECF No. 107-1 at PageID.873; *see also supra* Section I.A.1. Indeed, when Spreeman passed

away in early 2011, SSI's accountant sent his wife a letter explaining that this Agreement was expressly written "to qualify [SSI] as a minority owned business with [MDOT]." *Id.* Indeed, in accordance with this 2001 Agreement, SSI's accountant valued Spreeman's ownership interest in SSI at *33.33%*, not 51%, as held out to MDOT. *See id.* Second, the Government notes that, although the Second Superseding Indictment alleges Defendants' fraudulent overbilling scheme began in 2011, evidence suggests their overbilling began much earlier. *See* ECF No. 107 at PageID.864–65 (noting 2SI and 3SI were used to inflate SSI's overhead rate since "their inceptions" in the early 2000s, and noting "the Bartletts and other owners of SSI claimed their wives worked at SSI [when] they did not" "as early as . . . 2002"). Third, the Government identifies annual end-of-year equalization reports dating back to "the beginning of SSI's existence," which reflect that the SSI Groups' "profits, losses, tax liabilities, and expenses" "were tallied to determine" each Defendants' equal share. *Id.* at PageID.866.

The Government maintains this evidence would not be barred by Rule 404(b) because "by its very nature, [this evidence] does not involve *other* crimes, so there is no concern that it might be used as improper character evidence." *Id.* at PageID.867 (emphasis in original). The Government cites significant Sixth Circuit precedent standing for the proposition that "Rule 404(b) does not apply where the challenged evidence is 'inextricably intertwined' with evidence of the crime charged in the indictment." *Id.* at PageID.867–68 (citing *United States v. Barnes*, 49 F.3d 1144 (6th Cir. 1995); *United States v. Rozin*, 664 F.3d 1052 (6th Cir. 2012); *United States v. Holden*, 557 F.3d 698 (6th Cir. 2009); *United States v. Monsour*, 893 F.2d 126 (6th Cir. 1990)).

Provided nearly *8 months before trial*, the Government's written notice of this potential "other acts" evidence—and the Government's theories of admissibility—easily satisfies Rule 404(b)(3). Defendants do not argue otherwise. *See* ECF Nos. 123 at PageID,1457–58; 124. True,

Defendants Brian Bartlett and Adam Ball reply that the Government's potential "other acts" evidence is not "intrinsic" to the charged conspiracy or would otherwise be offered for impermissible propensity purposes, *see* ECF Nos. 123 at PageID,1457–58; 124. But these arguments only underscore the sufficiency of the Government's notice and are more appropriately presented throughout motions *in limine*.

At bottom, the Government does not intend to present "other acts" evidence and has provided Defendants with sufficient notice of potential 404(b) evidence months before trial. To the extent the Government identifies any additional "other acts" evidence it intends to introduce at trial, it has averred it will provide written notice at least 30 days before trial. ECF No. 107 at PageID.870. Rule 404(b)(3) requires nothing more, so Defendants' motion will be denied.

### IV. Defendants' Motion for *Enright* Hearing and Co-Conspirator Statement Proffer

Lastly, Defendants seek an *Enright* hearing and the Government's disclosure of "any and all potential co-conspirator statements" at least 30 days before this hearing. ECF No. 91 at PageID.643, 645. This motion turns on the proper procedure to address the admissibility of anticipated coconspirator statements as an exclusion from the general ban on hearsay evidence under the Federal Rules of Evidence.

### A.

Generally, out-of-court statements offered for the truth of the matter are inadmissible hearsay under Federal Rules of Evidence 801 and 802. *See* FED. RS. EVID. 801; 802. But, under Rule 801(d)(2)(E), an out-of-court statement offered for the truth of the matter asserted against an opposing party is *not* hearsay if it "was made by the party's coconspirator during and in furtherance for the conspiracy." FED. R. EVID. 801(d)(2)(E). To invoke this coconspirator hearsay exclusion, "Rule 104(a) requires the court" to find that (1) a conspiracy existed, (2) the defendant was a

member of the conspiracy, and (3) the statement was made by a coconspirator during the course and in furtherance of the conspiracy. *United States v. Mills*, No. 16-CR-20460, 2019 WL 77032, at *2 (E.D. Mich. Jan. 2, 2019); *see also* FED. R. EVID. 104(a) (requiring courts to decide "preliminary questions" of admissibility). In the Sixth Circuit, these requirements are commonly called "*Enright* findings." *See United States v. Vinson*, 606 F.2d 149, 152–53 (6th Cir. 1979) (discussing *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978)). The Government has the burden of satisfying each admissibility requirement by a preponderance of the evidence. *United States v. Stone*, No. 10-20123, 2011 WL 17613, at *2 (E.D. Mich. Jan. 4, 2011) (citing *United States v. Martinez*, 430 F.3d 317, 325 (6th Cir. 2005)). Importantly, courts can consider the coconspirator statements themselves when assessing the admissibility requirements. *Bourjaily v. United States*, 483 U.S. 171, 181 (1987). "But because these statements are presumptively unreliable, there must be some independent corroborating evidence of the defendant's knowledge and participation in the conspiracy for these statements to be admissible." *Mills*, 2019 WL 77032, at *2.

But when should district courts decide preliminary admissibility? And how? The Sixth Circuit has declined to set "hard and fast procedures." *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979). Instead, the Sixth Circuit has outlined three methods district courts can choose from in their sound discretion.

First, district courts may hold a pretrial *Enright* hearing during which the court hears—in the absence of a jury—the government's proof of a conspiracy and decides the preliminary admissibility question. *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979). If the court finds the coconspirator statements are admissible under Rule 801(d)(2)(E), the Parties proceed to trial and can freely introduce the statements. *Id.* Second, district courts may divide the trial and require the government to initially prove the presence of a conspiracy using only non-hearsay evidence.

*Id.* at 152–53 (noting this approach "avoids the danger . . . of injecting the record with inadmissible hearsay in anticipation of proof of a conspiracy which never materializes" (internal quotations omitted)). Third, district courts may conditionally admit all coconspirator statements, subject to the defendant's continuing objection and the Government's later demonstration of their admissibility by a preponderance of the evidence. *Id.* at 153. If, at the end of trial, the court concludes the Government has met its admissibility burden, "it should overrule the objection and let all evidence . . . go to the jury," subject to proper jury instruction on weight, admissibility, and the Government's burden of proof to convict. *Id.* "If, on the other hand, the court finds that the [G]overnment has failed to carry its burden, it should, on defendant's motion, declare a mistrial unless convinced that a cautionary jury instruction would shield the defendant from prejudice." *Id.*

## B.

Rule 801(d)(2)(E) is inescapable in the above-captioned case, where the Government has alleged all five Defendants conspired to commit wire fraud (Count I) and defraud the United States (Count II). *See generally* ECF No. 132. And the Government does not dispute that it "will seek to introduce co-conspirator statements in various forms." ECF No. 108 at PageID.897. Indeed, the Government proffers it will attempt to introduce:

1. "Written agreements among Defendants," including the alleged 2011 Secret Agreement;

2. "Email communications among Defendant" including the specific emails identified in the Second Superseding Indictment addressing Defendants' alleged DBE and end-of-year equalization schemes;

3. "Email and oral communications between Defendants and SSI employees," including "those directing SSI employees to assign business expenses to SSI Group entities without regard for their claimed independent corporate statuses, and generate fictitious invoices from SSI Group entities to SSI for services not rendered and including in overhead expenses on MDOT contracts;"

4. "Defendants' email and oral communications to third-party service providers and professional consultants; and"

5. "Defendants' written and oral misrepresentations to MDOT and USDOT officials," including Defendants' DBE applications, correspondences with USDOT throughout SSI's DBE appeal, and annual "no change affidavits" to maintain DBE certification.

*Id.* at PageID.897–98.

The only issue, then, is *when* and *how* this Court should determine the admissibility of these out-of-court coconspirator statements under Rule 801(d)(2)(E). Defendants seek an *Enright* hearing. ECF Nos. 91; 95; 101; 128. The Government seeks conditional admission. ECF No. 108. The Government's approach makes more sense.

The Sixth Circuit recognized over fifty years ago that *Enright* hearings were aptly criticized as "burdensome, time-consuming, and uneconomic." *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979). These criticisms have only intensified since. *See, e.g.*, *United States v. Marshall*, No. 09-20536-BC, 2011 WL 1598955, at *3 (E.D. Mich. Apr. 27, 2011) (noting *Enright* hearings are more burdensome than conditional admission); *United States v. Williams*, No. 06-CR-20411, 2010 WL 272142, at *2 (E.D. Mich. Jan. 15, 2010) (noting *Enright* hearings "waste judicial resources" and result in duplicative "trial[s] within []trial[s]"). Recognizing these criticisms, the "general and preferred practice within this Circuit" is conditional admission—not *Enright* hearings. *United States v. Bell*, No. CR 17-20183, 2022 WL 993634, at *3 (E.D. Mich. Apr. 1, 2022); *see also United States v. Norwood*, No. 12-CR-20287, 2014 WL 1795560, at *2 (E.D. Mich. May 6, 2014) (collecting cases); *United States v. Holloway*, 740 F.2d 1373, 1375 n. 2 (6th Cir. 1984) (noting conditional admissions are "firmly entrenched in this circuit's practice").

Defendants cling to complexity and argue an *Enright* hearing is nevertheless necessary because this is a "complex multi-defendant case with a voluminous amount of discovery." ECF

No. 91 at PageID.649. Without question. The Government alleges a decade-long conspiracy involving five individuals, four companies, and countless contracts with MDOT. *See generally* ECF No. 132. And every estimate provided by the Parties suggests trial will last longer than one month. But the complexity of this case underscores the propriety of the *Government's*—rather than *Defendant's* chosen approach to coconspirator statement admissibility determinations. *See Norwood*, 2014 WL 1795560, at *2 (E.D. Mich. May 6, 2014) ("In light of the complexities and intricacies of this case . . . the Court concludes that utilizing the third option—conditionally admitting the statements—would best serve the interests of fairness and judicial economy [by] allow[ing] the Court to view the statements in context, while also eliminating the burden and expense of holding a duplicative pre-trial hearing."); *United States v. Bell*, No. CR 17-20183, 2022 WL 993634, at *3 (E.D. Mich. Apr. 1, 2022) (denying defendant's motion for an *Enright* hearing because it would be duplicative of the anticipated six-week trial).

Defendants seem to separately seek the Government's written pretrial proffer of anticipated coconspirator statements. ECF No. 91 at PageID.649–52. But such proffer is unnecessary and would largely duplicate the work the Government has already done. Defendants cite four recent decisions directing the Government to provide pretrial proffers of anticipated out-of-court coconspirator statements. *Id.* But, in all cases, the Court ordered proffers *before* deciding on whether to conduct an *Enright* hearing, mainly because the Court and the defendants largely did not know what coconspirator statements the Government would seek to introduce at trial. *See United States v. Bell*, No. 17-CR-20183, 2020 WL 7041182, at *3–5 (E.D. Mich. Dec. 1, 2020);[14]

---

[14] Notably, over one year after directing the Government to provide a pretrial proffer, the *Bell* Court denied defendants' request for an *Enright* hearing, choosing instead to conditionally admit all coconspirator statements. *United States v. Bell*, No. CR 17-20183, 2022 WL 993634 (E.D. Mich. Apr. 1, 2022).

*United States v. Mills*, No. 16-CR-20460, 2019 WL 77032, at *4 (E.D. Mich. Jan. 2, 2019); *United States v. Fayad*, 22-cv-20188 (E.D. Mich. 2022), ECF No. 172; *United States v. Cortez Blake*, 22-cr-20519 (E.D. Mich. 2022), ECF No. 248 at PageID.1752–54. Such is not the case here, where (1) in response to Defendants' motion, the Government identified the five specific categories of coconspirator statements it will seek to introduce at trial, ECF No. 108 at PageID.897–98, and (2) in the Government's June 2024 reverse proffer, it provided all Defendants and their attorneys with the emails, statements, and financial documents it considers critical to its case. *See* ECF Nos. 113-1 (sealed); 113-2 (sealed); 113-3 (sealed). Accordingly, although some courts have found written proffers warranted in some circumstances, such proffer is not warranted here. *See United States v. Johnson*, No. 11-20551-40, 2014 WL 12703420, at *1 (E.D. Mich. Mar. 26, 2014) ("While Defendant would no doubt welcome the chance to preview the Government's case and how it intends to present that case to the jury, the court declines to force the Government to provide this roadmap[.]").

In sum—and in line with the general trend in the Sixth Circuit—this Court declines to conduct an *Enright* hearing to determine the admissibility of out-of-court coconspirator statements because, considering this case's complexity, such hearing would be "burdensome, time-consuming, and uneconomic." *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979). Instead, this Court will conditionally admit all out-of-court coconspirator statements subject to Defendants' continuing hearsay objection[15] and the Government's "later demonstration," by a preponderance of the evidence, that  (1)  a conspiracy existed, (2) the Defendant against whom the statement is offered was a member of the conspiracy, and (3) the statement was made by that Defendants'

---

[15] To the extent any Defendant wishes to object to any out-of-court coconspirator statement on any *other* evidentiary ground—such as unfair prejudice under Rule 403—they are free to do so at trial.

coconspirator during the course and in furtherance of the conspiracy. *Id.* at 153. At the conclusion of the Government's case-in-chief, this Court will rule on Defendants' hearsay objection and determine whether the statements are admissible under Rule 801(d)(2)(E). *Id.*

**V.**

Accordingly, it is **ORDERED** that Defendant Brian Bartlett's Motion for Certain Information Required by Federal Criminal Rules 12 and 16, ECF No. 89, is **DENIED.**

Further, it is **ORDERED** that, to the extent it anticipates calling any expert witnesses at trial—including the "two to three" MDOT auditors identified in its Response to Defendant's motion, ECF No. 109, the Government is **DIRECTED** to provide all Defendants with all disclosures required by Federal Criminal Rule 16(a)(1)(G)(iii), at least thirty days before trial.

Further, it is **ORDERED** that Defendant Brian Bartlett's Motion for Pretrial Disclosure of All Evidence Which the Government Intends to Offer Pursuant to Rule 404(b) of the Federal Rules of Evidence, ECF No. 90, is **DENIED.**

Further, it is **ORDERED** that Defendant Brian Bartlett's Motion for a Written Proffer and *Enright* Hearing, ECF No. 91, is **DENIED.**

**This is not a final order and does not close the above-captioned case.**

Dated: October 31, 2024                         s/Thomas L. Ludington
                                                THOMAS L. LUDINGTON
                                                United States District Judge