UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                 Case No. 23-20676

     v.                      HON. THOMAS L. LUDINGTON
                                 United States District Judge

D-1 JEFFREY BARTLETT,

        Defendants.

_____/

### GOVERNMENT'S RESPONSE AND BRIEF TO DEFENDANT JEFFREY BARTLETT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, PRECLUDE ADMISSION OF EVIDENCE AND ARGUMENT REGARDING "COMMON CONTROL" [ECF NO. 189]

In his Motion, J. Bartlett mischaracterizes the government's prosecution theory and evidence, and then misapplies the rule of lenity. This Court, however, has already recognized that the government's prosecution theory is more than a mere allegation that Defendants unwittingly violated the "common control" regulation. Rather, as to that part of the charged scheme, the government alleges that the "Defendants fraudulently represented [to MDOT/USDOT] that the other SSI Group companies—2SI, 3SI, and Southfield IT—were independent such that Defendants could charge MDOT artificially inflated prices for fictitious

rental 'costs.'" ECF No. 150, PageID.1631 (citing Second Superseding Indictment at ECF. 132, PageID.1516–19). By concealing the Defendants' Secret Agreement and their co-equal ownership in the SSI Group companies from MDOT, and repeatedly lying about the same for years, the Defendants influenced *how* MDOT applied the common control rule so SSI received claimed reimbursements and profits to which it was not entitled. Because Defendants are charged with lying to MDOT and USDOT about facts necessary for MDOT to properly apply the common control regulation—and not simply misconstruing it—the Court should deny the Motion. Moreover, as evidenced by J. Bartlett's extensive reliance on purported evidence outside the indictment, his motion to dismiss should be denied because it cannot "be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). At best, the Motion is premature. Factual disputes are for the jury to resolve.

## Issue Presented

Whether the indictment should be dismissed on rule-of-lenity grounds where J. Bartlett fails to assert that any operative term in the charged criminal statutes is ambiguous?

## Principal Authorities

- *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998)

- *United States v. Lechner*, 806 F.3d 869, 874-76 (6th Cir. 2015)

- *United States v. Ouwenga*, 173 F. App'x. 411 (6th Cir. 2006)

- *United States v. Wagner,* 382 F.3d 598, 610 (6th Cir. 2004)

## Relevant Factual Background

Contrary to J. Bartlett's narrative (Mot. at 8-11), Michigan state auditors did not *knowingly* "waive[] off" concerns about common control and SSI in February 2012 and later "struggle" to apply the rule to SSI in 2018. Rather, as alleged in the indictment, the Defendants successfully concealed their co-equal ownership and control over SSI group entities from MDOT and USDOT for years *before* their fraudulent overbilling scheme was uncovered by MDOT and began to unravel in 2018. Resolution of that factual dispute is for the jury to decide rather than this Court in the context of whether the indictment is legally sufficient.

The Defendants are charged with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (Count 1); conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (Count 2); and wire fraud/aiding and abetting in violation of 18 U.S.C. §§ 1343, 2 (Counts 3-

3

15). (ECF. 132, PageID.1516–19.) As the Court previously recognized, the charges arise from alleged fraudulent conduct "in three parts," just one of which involved the Defendants "fraudulently misrepresent[ing] SSI's overhead and labor costs to artificially inflate MDOT's reimbursement." (ECF. 150, PageID.1623.) As to that part, Defendants overbilled MDOT through "two separate schemes flush with fraudulent misrepresentations and omissions." *Id.*, PageID.1630. The first scheme "concerned SSI relationship to other companies" and resulted in MDOT *not* finding violations of the common control rule and overpaying SSI for claimed overhead expenses for which it was not entitled. *Id.*, PageID.1630-36.

Of relevance to resolving this Motion, the Court previously recognized certain factual allegations and related evidence:[1]

- On February 25, 2011—just  after Defendant Jeffery Bartlett acquired control of SSI—all Defendants entered into a written 'Secret Agreement' that provided that all Defendants would be equal owners of the "SSI Group"—a group of companies including (1) SSI, (2) Southfield IT, (3) 2SI Development, LLC

---

[1] The government will not repeat here the Court's full recitation of the factual allegations and evidence against the Defendants, *see generally* ECF. 150, PageID.1623–39, but incorporates it by reference.

("2SI"), (4) 3SI Building and Leasing, LLC ("3SI"), and (5) Geo Precision Services, LLC ("Geo"). *Id.*, Page ID.1626.

- The Secret Agreement read as follows:

  It is the intent of this agreement that the Buyers and sellers will each own a 20 percent undivided interest in the above named companies at the completion of the "Buy In" period. Regardless of how the Articles of Incorporation, stock ownership, By Laws, etc. are written/retained; the intent is for all 5 parties to have *equal ownership of the companies* at the completion of the "Buy In" period.

  *Id.* (emphasis in the original).

- Less than two months after signing the alleged 2011 Secret Agreement, Defendant Brian Bartlett emailed Defendants Jeffrey Bartlett, Adam Ball, Anthony Thelen, and Andrew Semenchuk with the suggestion that all Defendants "sit down" and come up with a "better structure to the [SSI Group] org chart" so they could "easi[ly] keep [their] stories straight" when discussing the entities. *Id.* n.4 (citing ECF No. 113-2 at PageID.1138 (sealed)). After Defendant Jeffrey Bartlett responded, Defendant Brian Bartlett replied to all Defendants, highlighting the need to "keep all of [their] *lies* straight so [they]

5

don't look like idiots." *Id.* n.4 (citing ECF No. 113-2 at PageID.1142 (sealed)).

- By December 2012, Semenchuk was SSI's purported majority owner. But, based on the Defendants' 2011 Secret Agreement, Semenchuk, in reality, only owned a 20% share of SSI equal to all other Defendants, and "never had ultimate managerial control." *Id.*, PageID.1627 (citing ECF No. 132 at PageID.1514).

- After MDOT denied SSI's 2013 application for Disadvantage Business Enterprise (DBE) status and sought more information, Semenchuk told MDOT officials—contrary to the 2011 Secret Agreement—that "neither he nor any owners of SSI possessed *any* ownership interest in" 2SI or 3SI, and that all were "totally separate and distinct entities." *Id.*, PageID.1627 (citing USDOT Letter, pg. 2–3.).

- In later reversing MDOT's denial, USDOT found "nothing in the record" to suggest Defendant Brian Bartlett and Anthony Thelen's dual status as SSI employees and owners of 2SI and 3SI compromised SSI's independence. *Id.*, PageID.1628 (citing USDOT Letter, pg. 4.). However, the "record" the USDOT

reviewed in 2015 is not the same as the evidentiary record currently before the Court. Indeed, it is unclear whether USDOT's 2015 administrative investigation considered the evidence uncovered throughout the Government's criminal investigation in 2019, including Defendants' alleged 2011 Secret Agreement. *Id.*, PageID.1628 n.5.[2]

- After SSI received DBE certification, Semenchuk submitted fraudulent "No Change Affidavits" in 2016, 2017, and 2018 that maintained that he was still SSI's majority owner despite the

---

[2] Nine days before executing the 2011 Secret Agreement granting him 20% ownership of 3SI and other SSI Group entities, J. Bartlett sent a "sworn statement" to Senior Auditor Karen Liang stating, "I do not in any way own any part of the Standish Property that we lease." See Exh. A. And, although too voluminous to recite here, the criminal investigation initiated in 2019 uncovered substantial evidence of Defendants' awareness of the common control rule and deceit regarding their relative ownership in and control over the SSI Group entities, including witness testimony, email communications among Defendants, and other documents. In 2015, USDOT was not privy to much of this evidence. For example, on May 5, 2014 Defendant Semenchuk sent an email to the other Defendants entitled, "Some interesting articles about Common control and the Audit process," with an article addressing a common control issue attached. J. Bartlett replied, "I think that the 3SI cost of rent of the office buildings is probably at or below the constructive cost of ownership. The 2SI survey equipment is probably what we may have an issue with." See Exh. B.

2011 Secret Agreement, which provided that Semenchuk only owned 20% share of the SSI Group companies. *Id.*, PageID.1629.

- After MDOT awarded SSI various transportation contracts, Defendants artificially created and inflated costs subject to MDOT reimbursement through a series of misrepresentations about SSI's relationship with the other SSI Group companies and its own employees. *Id.*, PageID.1629 (citing ECF No. 132, PageID.1516–22). "And, critical to the Government's case, if the contractor rents real or personal property from a commonly controlled entity, [the Federal Acquisition Regulations] prohibit the contractor from including these costs. Instead, contractors renting from commonly controlled entities can only include—as part of their reimbursable overhead rate—the normal costs of ownership, such as "depreciation, taxes . . . and maintenance" for the specific piece of rented property. *Id.*, PageID.1630 (citing 48 C.F.R. § 31.205–36(b)(3) and ECF No. 132 at PageID.1518).

- By fraudulently misrepresenting SSI's relationship to 2SI, MDOT auditors estimated that Defendants overbilled MDOT by nearly $6,000,000 from 2016 through 2018, including by

overbilling MDOT over $1,300,000 for SSI's "excessive use" of a 2SI scanner in 2018 alone, *id.*, PageID.1631-32 (citing ECF No. 88-1 at PageID.472–76 (sealed)), and overbilling MDOT on rental car costs by $2,038,528.70. *Id.*

- Defendants "agreed to and did submit fraudulent claims to MDOT for rent payments from SSI to 3SI, [hiding] from MDOT the fact that SSI and 3SI" were commonly controlled. *Id.*, PageID1633 (citing ECF No. 132, PageID.1519). Had Defendants disclosed that SSI and 3SI were commonly controlled, they would have only received MDOT's reimbursement for the "normal costs of ownership" (taxes, depreciation, maintenance). *Id.* But, the Government alleges SSI billed MDOT for the full amount SSI paid 3SI to rent office space in Standish and St John's, Michigan. *Id.* (citing ECF No. 88-1 at PageID.468–69 (sealed)). In total, MDOT auditors estimate that, from 2016 through 2018, SSI overbilled MDOT by $518,550.58 for its rental costs to 3SI. *Id.* at PageID.471.

- Despite evidence that Defendants exercised common control over Southfield IT, Defendants represented to MDOT that Southfield

IT was independent from SSI, and created "fictitious contracts and invoices" between the two companies to "fraudulently inflate their overhead costs which were then reimbursed by MDOT." *Id.*, PageID.1635 (citing ECF No. 132 at PageID.1516). According to the FBI's investigation, SSI billed MDOT a total of $1,575,304.30 for IT services it claimed to receive from Southfield IT in 2015, 2016, and 2017. *Id.* (citing ECF No. 88-1 at PageID.463 (sealed)). But, the FBI concluded that SSI spent "less than $145,184.73 on IT services . . . from January 2016 through February 2019." *Id.*

- Notably, on December 31, 2014, Defendant Semenchuk sent Defendants Adam Ball, Brian Bartlett, and Jeffrey Bartlett an email entitled "SSI IT Company," which noted all Defendants discussed "forming an IT company for [overhead] reasons" and suggested "all of [SSI's actual IT provider's] bills [could] go to this new company" such that the expenses could "be marked up before [being] sent to SSI." *Id.*, PageID.1635-36 (citing ECF No. 113-1 at PageID.1007 (sealed)). J. Bartlett replied, "I Like it!" *Id.* (citing at ECF No. 113-1 at PageID.1008 (sealed)). In 2016, Defendant Semenchuk subsequently directed an employee of

SSI's actual IT provider to "re-issue certain SSI invoices to Southfield IT," such that SSI's actual IT provider "always supported SSI regardless of [whether] it was billed to SSI or Southfield IT[.]" *Id.* (citing ECF No. 88-1 at PageID.467 (sealed)).

- Defendants personally benefited from the fruits of their alleged fraudulent overbilling labor by "equalizing" the income of all SSI Group companies, such that each Defendant received, pursuant to the 2011 Secret Agreement, their 20% share of the Groups' net income at the end of each fiscal year. *Id.*, PageID.1637-38 (citing ECF No. 132 at PageID.1520–22). To do so, Defendants would offer fictitious "loans" to one another and take fake loans from the SSI Group entities, with the expectation that the loans would never be paid. *Id.*

## **Legal Standard**

The rule of lenity is a rule of statutory construction that requires ambiguous criminal statutes (or implementing regulations) to be interpreted in favor of the defendants subjected to them. *United States v. Santos*, 553 U.S. 507 (2008) (construing term "profits" in federal money-laundering statue); *United States v. Boucha,* 236 F.3d 768, 774

11

(6th Cir. 2001) (construing meaning of "person or presence" in section of the Sentencing Guidelines applicable to the federal carjacking statute). "Th[e] rule applies only when a criminal statute contains a 'grievous ambiguity or uncertainty,' and 'only if, after seizing everything from which aid can be derived,' the Court 'can make no more than a guess as to what Congress intended.'" *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (quoting *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998)). "In evaluating whether a statute is ambiguous for rule-of-lenity purposes, it is not enough for the plain language to be unclear; only when the plain language, structure, and legislative history provide no guidance will we apply the rule of lenity." *United States v. Wagner*, 382 F.3d 598, 610 (6th Cir. 2004).

In the Motion, J. Bartlett seeks dismissal of all charges in the indictment on rule-of-lenity grounds, arguing that the government's theory of prosecution is predicated on an undefined and confusing term in the federal acquisition regulations—"common control" (Mot. at 7-19). In the alternative, he argues that even if the government's theory of prosecution represents a plausible interpretation of "common control" that differs from that of Defendants, the Court must resolve the

ambiguity in the Defendants' favor and preclude the government from presenting it (Mot. at 23). J. Bartlett mischaracterizes the government's theory of prosecution and misapplies the rule of lenity. The Court should deny the Motion.

**A. Because J. Bartlett does not assert that the language of the charged statutes is ambiguous, the rule of lenity does not apply.**

Defendants are charged with conspiracy to commit wire fraud, conspiracy to defraud the United States, and substantive wire fraud. J. Bartlett does not claim that any term in any of the charged criminal statutes or any implementing regulations (there are none) is ambiguous. As such, the rule of lenity does not apply.

As an initial matter, J. Bartlett conflates the constitutional void-for-vagueness doctrine with the canon of statutory construction rule of lenity to bolster his generic argument for relief. Citing *Connally v. Gen Constr. Co.*, 269 U.S. 385 (1926) and *Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1107 (6th Cir. 2012), J. Bartlett suggests (Mot. at 7-8) that the rule of lenity broadly encompasses "vague laws [that] may trap the innocent by not providing fair warning." In *Connally* and *Columbia Nat. Res.*, however, the rule-of-lenity was neither raised nor considered.

*See generally Connally*, 269 U.S. 385 (1926) (evaluating constitutional void-for-vagueness claim with no reference to the rule of lenity); *Columbia Nat. Res.*, 58 F.3d 1101 (same).

While related, the constitutional void-for-vagueness doctrine and the canon of statutory construction rule of lenity apply different legal standards. In *United States v. Lechner*, 806 F.3d 869, 874-76 (6th Cir. 2015), the Sixth Circuit explained that a criminal statute is void for vagueness when it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Id.* (citing *United States v. Harriss,* 347 U.S. 612, 617 (1954) and *Johnson v. United States,* 576 U.S. 591(2015)). In contrast:

> The related rule of statutory construction—the rule of lenity—prescribes that 'where there is ambiguity in a criminal statute,' courts should resolve the ambiguity in favor of the defendant. *Id.* (citing *United States v. Bass,* 404 U.S. 336, 348 (1971)). When we evaluate whether a statute is ambiguous under the rule of lenity, *it is not enough for the language to be unclear.* We apply the rule "only when the plain language, structure, and legislative history provide no guidance." *United States v. King*, 516 F.3d 425, 432 (6th Cir. 2008). A statute is not ambiguous merely because it is '*possible* to articulate a construction more narrow than that urged by the Government.' Citing *Moskal v. United*

14

*States,* 498 U.S. 103, 108 (1990) (emphasis added).

*Id.* at 875-76. This is an important distinction because "the rule of lenity, as currently analyzed and applied in the federal courts, is a canon of statutory construction, an 'aid for resolving an ambiguity ... [that] comes into operation at the end of the process of interpreting what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.'" *Callanan v. United States*, 364 U.S. 587, 596 (1961). And, in *Columbia Nat. Res.*, the Sixth Circuit explicitly held: "That the mail and wire fraud statutes are not unconstitutionally vague is beyond dispute," 58 F.3d at 1107. This probably explains why J. Bartlett cites void-for-vagueness cases, but does not expressly make that claim.

Here, J. Bartlett invokes the rule of lenity, but fails to identify any ambiguous terms in any of the charged statutes or implementing regulations. In *United States v. Ouwenga*, 173 F. App'x. 411 (6th Cir. 2006), the Sixth Circuit rejected a generic rule-of-lenity challenge to a § 371 conspiracy to defraud conviction under similar circumstances.  In *Ouwenga*, the defendant used false tax information and employer

identification numbers, distant locations, and alter egos to attempt to hide taxable income from the IRS. *Id.* at 412. The defendant claimed that her conviction based on the defraud prong of 18 U.S.C. § 371 violated the rule of lenity because it has "no ascertainable meaning." *Id.* at 417. Rejecting the argument, the Court stated, "the statute leaves no room for doubting the criminality of conspiring to defraud the government by taking steps to evade a duty to pay taxes." *Id.* (citing *Hammerschmidt v. United States*, 265 U.S. 182, (1924) ("To conspire to defraud the United States means primarily [1] to cheat the Government out of property or money, but it also means [2] to interfere with or obstruct one of its lawful governmental functions by deceit, craft, or trickery, or at least by means that are dishonest.").

Like in *Ouwenga*, Defendants are charged with cheating governmental entities—MDOT and USDOT—out of money in various ways, including by lying about their co-equal ownership and control over the SSI Group entities. Simply put, they lied to get money. They are not charged with violating ambiguous statutes or regulations that implement those statutes—the Federal Acquisition Regulation on common control with which J. Bartlett takes issue does *not* implement

16

the federal wire fraud and criminal conspiracy statutes. Rather, Defendants are charged with deceiving the government, thereby enabling SSI to claim an inflated overhead rate and related profits that MDOT would have disallowed had it known the truth.[3]

With one exception, the handful of cases J. Bartlett cites where Courts have actually analyzed the rule of lenity are in the context of claims that the charged statutes or their implementing regulations contained ambiguous terms. Mot. at 6 (citing *Jones v. United States*, 529 U.S. 848, 858 (2000) (analyzing language of the federal arson statute, 18 U.S.C. § 844(i)—"used  in ... any activity affecting ... commerce") and *Crandon v. United States*, 494 U.S. 152, 158-60 (1990) (analyzing "particular statutory language" of criminal conflicts statute, 18 U.S.C. § 209); Mot. at 7 (citing *Bittner v. United States*, 598 U.S. 85, 201 (2023) (analyzing Bank Secrecy Act and implementing regulations) and *United States v. Caseer*, 399 F.3d 828, 832-39 (6th Cir. 2005) (rejecting a fair warning/vagueness challenge (and referencing the "rule

---

[3] Because J. Bartlett does not cite a single case in which a defraud clause conspiracy charge under 18 U.S.C. § 371 was dismissed on rule-of-lenity grounds, and the government is not aware of any, the Court should find *Ouwenga* dispositive on the issue as applied to Count 2.

17

of lenity") to the Controlled Substances Act and implementing Schedules, even though the schedule used obscure scientific term "cathinone" without explicitly referencing "khat"); Mot. at 13 (citing *United States v. Tyson Foods*, Inc. 258 F. Supp. 2d 809, 819 (E.D. Tenn 2003) (dismissing on rule-of-lenity grounds a § 371 conspiracy to commit another federal criminal offense—namely, using fraudulent "identification documents" in violation of 18 U.S.C. §§ 1546(b)—because the statutory term "identification document" was not defined, making it "manifestly ambiguous" as applied to Social Security cards). Because these cases involved an analysis of language contained in the charged statutes or their implementing regulations, they are readily distinguishable from J. Bartlett's rule-of-lenity claim here.

J. Bartlett's reliance (Mot. at 11) on *United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004), is similarly unpersuasive. In *Chandler*, a § 371 conspiracy to commit wire fraud indictment charged the defendants with defrauding McDonald's by representing themselves fraudulently as "legitimate winners" when they checked the box on a McDonald's prize redemption form indicating they obtained their game stamps through "authorized, legitimate channels." *Id.* at 804. The

government conceded that there was no rule that explicitly prohibited the transfer of the game stamps, but asserted that the rules affirmatively demanded acquisition of the game stamps through "authorized channels" (i.e., McDonald's dissemination of the stamps) and not from others. *Id.* The trial evidence established that the game stamps were publicly traded, including on E-bay and on McDonald's own website, and a McDonald's representative testified that game players could transfer stamps to anyone, including strangers. *Id.* The court reversed the defendant's conspiracy to commit mail fraud conviction on rule-of-lenity grounds, reasoning that McDonald's game rules did not explicitly prohibit receiving game stamps from others *and* the government had failed to prove that defendants misrepresented that they were "legitimate" winners. *Id.* at 805.

Here, by contrast, Defendants are not simply alleged to have "checked" a box indicating that they did not have "common control" over the SSI Group entities. For almost a decade, they affirmatively and repeatedly misrepresented specific facts to MDOT and USDOT that would have revealed their co-equal ownership in and control over the SSI Group entities, thereby preventing MDOT and USDOT from

19

determining that the entities were commonly controlled and only entitled to receive and claim certain reimbursable expenses. Unlike in *Chandler*, where the game rules did not explicitly prohibit receiving stamps from others, the FAR regulation on common control expressly identifies those expenses that commonly controlled entities can and cannot claim for reimbursement. And, unlike in *Chandler*, the government will introduce ample proof that Defendants knew commonly controlled entities could only claim certain rental expenses for reimbursement from MDOT and, knowing this, deliberately deceived MDOT and USDOT about their co-equal ownership interests so they could fraudulently inflate their claims. *See also United States v. Jasen*, 693 F. App'x. 801, 802-03 (11th Cir. 2017) (rejecting constitutional void-for-vagueness and rule of lenity arguments that wire fraud statute should not extend to fraudulent real estate transactions because § 1343 "applies to 'any' scheme or artifice to defraud, regardless of the type of scheme," and defendant failed to identify any ambiguity in the statute.).

In short, Defendants are not charged with criminal violations of the common control rule found in the federal acquisition regulations. They are charged with making fraudulent factual representations and

omitting material factual information about their co-equal ownership of and control over the SSI Group entities to influence how MDOT applied the rule to SSI's claimed reimbursable costs.

**B. Even applying a rule-of-lenity analyses to the Federal Acquisition Regulation's use of the term "common control," that term is not so grievously ambiguous or uncertain as to require dismissal of the indictment.**

Contrary to J. Bartlett's suggestion, the government's evidence will show that Defendants understood that if they revealed the true, co-equal ownership interests in the SSI group companies to MDOT, SSI would not have been allowed to receive reimbursement for the inflated expenses they claimed under the common control rule. While Defendants may well attempt to introduce evidence and make arguments at trial to undermine the government's case (some of which appear in the Motion), J. Bartlett offers no legal basis to preclude the government from presenting well-recognized fraud prosecution theories and supporting evidence at trial.[4]

---

[4] The Motion (at 8-10) goes to great lengths to suggest that, in 2018, Michigan state auditor Chris Schafer was improperly "targeting" the work of an industry auditor used by SSI and others, which somehow tainted his team's review of SSI's reimbursements claims. At trial, the government will present substantial evidence to rebut this false narrative. The Motion makes unclear, however, how one state auditor's

21

To convict Defendants of wire fraud under 18 U.S.C. § 1343, the government must prove "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (internal citations omitted). "A scheme to defraud includes *any* plan or course of action by which someone intends to deprive another by deception of money—deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Gold Unlimited, Inc.,* 177 F.3d 472, 479 (6th Cir. 1999) (emphasis added); *see also United States v. Kurlemann*, 736 F.3d 439, 446 (6th Cir. 2013) (a scheme to defraud "include[s] a broad[] range of deceptive conduct"). The required deceit may be accomplished, for example, through false or misleading statements or omissions, *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998); half-truths, *Universal*

---

good faith efforts to apply the "common control" regulation to SSI's claimed reimbursements in the context of *affirmatively misleading and incomplete information provided by SSI* is germane to the Court's resolution of this Motion. At best, the Motion further illustrates that— given the unresolved factual disputes in this pretrial posture— resolution of the Motion under Rule 12 is inappropriate.

*Health Servs., Inc. v. United States*, 579 U.S. 176, 187-88 (2016); or even non-verbal conduct, *United States v. Trapilo*, 130 F.3d 547, 550 n.3 (2d Cir. 1997); *see United States v. McAuliffe*, 490 F.3d 526, 533 (6th Cir. 2007) ("'[F]raud' refers to conduct or speech intended to mislead the putative victim into parting with money or property.") (quoting *United States v. Klein*, 476 F.3d 111, 113 (2d Cir. 2007)); see also *United States v. Se Keun Oh*, 200 F. App'x. 545, 553 (6th Cir. 2006). These cases establish a broad range of conduct that may constitute fraud under the wire fraud statute.

"[T]he elements of a section 371 conspiracy to defraud are: (1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense, i.e., to defraud the United States." *United States v. Douglas*, 398 F.3d 407, 413 (6th Cir. 2005); *see also Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) ("To conspire to defraud the United States means primarily [1] to cheat the Government out of property or money, but it also means [2] to interfere with or obstruct one of its lawful governmental functions by deceit, craft, or trickery, or at least by means that are dishonest.").

The federal regulation on "common control," 48 C.F.R. § 31.205-63(b)(3), states that the following rental costs are allowable:

> (3) Charges in the nature of rent for property between any divisions, subsidiaries, or organization under common control, to the extent that they do not exceed the normal costs of ownership, such as depreciation, taxes, insurance, facilities capital cost of money, and maintenance (excluding interest or other unallowable costs pursuant to part 31), provided that no part of such costs shall duplicate any other allowed cost. Rental cost of personal property leased from any division, subsidiary, or affiliate of the contractor under common control, that has an established practice of leasing the same or similar property to unaffiliated lessees shall be allowed in accordance with subparagraph (b)(1) above.

*Id.*

In short, the plain language of the wire fraud statute and conspiracy to defraud clause of section 371, in combination with 48 C.F.R. § 31.205-63(b)(3)'s language addressing organizations and affiliates  under "common control," is sufficiently clear to guide Defendants in what was and was not lawful in the context of this case. *Lechner*, 806 F.3d at 875-76 ("[I]t is not enough for the language to be unclear. We apply the rule 'only when the plain language, structure, and legislative history provide no guidance.'") Even were it not clear, the language is not so "grievously ambiguous or uncertain" as to warrant the extraordinary relief sought here. *Ocasio*, 578 U.S. at 295

24

n.8. Indeed, the charged scheme to deceive by Defendants is straight-forward—they lied to MDOT/USDOT about their co-equal ownership and common control of the SSI Group entities so that SSI could receive inflated expenses and profits to which they were not entitled.  If proven, such conduct violates the wire fraud statute and the § 371 conspiracy to defraud clause. J. Bartlett is free to present his factual claims to a well-instructed jury for them to resolve. Rule 12, however, does not permit him to require this Court to preemptively decide those questions.

## Conclusion

For the foregoing reasons, the Court should deny the Motion.

<div style="margin-left:50%">

Respectfully submitted,

JULIE A. BECK
Acting United States Attorney


*/s/ T. Patrick Martin*
T. Patrick Martin
Karen Reynolds
William J. Vailliencourt, Jr.
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Thomas.Martin@usdoj.gov
(313) 226-9168
MI Bar No. P86940

</div>

February 5, 2025

25

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2025, I electronically filed the

foregoing paper with the Clerk of the Court using the ECF system,

which will send notification of such filing to the attorneys of record.

*/s/ T. Patrick Martin*
T. Patrick Martin
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Thomas.Martin@usdoj.gov
(313) 226-9168
MI Bar No. P86940

26