United States District Court
Eastern District of Michigan
Northern Division

United States of America,

v.

D-4 Brian Bartlett,

Defendant.

_____/

Case No. 23-cr-20676

Hon. Thomas L. Ludington

## Plea Agreement

The United States of America and Defendant have reached a plea agreement under Federal Rule of Criminal Procedure 11. The plea agreement's terms are:

### 1. Count of Conviction

Defendant will plead guilty to Count 2 of the Second Superseding Indictment. Count 2 charges Defendant with Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371. If the Court accepts this agreement and imposes sentence consistent with its terms, the United States Attorney's Office for the Eastern District of Michigan will move

to dismiss any remaining charges in the Second Superseding

Indictment against Defendant.

## 2. Statutory Maximum Penalties

Defendant understands that the count to which he is pleading

guilty carries the following maximum statutory penalties:

| Count 2 | Term of imprisonment: | 5 Years |
|---------|----------------------|---------|
| | Fine: | $250,000, or twice the pecuniary gain or loss, 18 U.S.C. § 3571(d) |
| | Term of supervised release: | 3 years |

## 3. Elements of Counts of Conviction

The elements of Count 2, charging a violation of Title 18, United

States Code, Section 371, are:

First, that two or more persons conspired, or agreed, to defraud

the United States, or one of its agencies or departments, by dishonest

means.

Second, that Defendant knew of the conspiracy and its objects,

aims, or goals.

Third, that Defendant joined the conspiracy with the intent that at least one of conspirators engage in conduct that satisfies the elements of defrauding the United States.

Fourth, that a member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.

## 4. Factual Basis

The parties agree that the facts in Attachment A are true, accurately describe the defendant's role in the offense, and provide a sufficient factual basis for the defendant's guilty plea.

## 5. Advice of Rights

Defendant has read the Second Superseding Indictment, has discussed the charges and possible defenses with his attorney, and understands the crimes charged. Defendant understands that, by pleading guilty, he is waiving many important rights, including the following:

A.   The right to plead not guilty and to persist in that plea;

B.   The right to a speedy and public trial by jury;

C.    The right to be represented by counsel—and, if necessary, have the court appoint counsel—at trial;

D.    The right to be presumed innocent and to require the government to prove Defendant guilty beyond a reasonable doubt at trial;

E.    The right to confront and cross-examine adverse witnesses at trial;

F.    The right to testify or not to testify at trial, whichever Defendant chooses;

G.    If Defendant chooses not to testify at trial, the right to have the jury informed that it may not treat that choice as evidence of guilt;

H.    The right to present evidence or not to present evidence at trial, whichever Defendant chooses; and

I.    The right to compel the attendance of witnesses at trial.

### 6. Collateral Consequences of Conviction

Defendant understands that his conviction here may carry additional consequences under federal or state law. Defendant understands that, if he is not a United States citizen, his conviction here may require him to be removed from the United States, denied citizenship, and denied admission to the United States in the future. Defendant further understands that the additional consequences of his conviction here may include, but are not limited to, adverse effects on his immigration status, naturalized citizenship, right to vote, right to carry a firearm, right to serve on a jury, and ability to hold certain licenses or to be employed in certain fields. Defendant understands that no one, including his attorney or the Court, can predict to a certainty what the additional consequences of his conviction might be. Defendant nevertheless affirms that he chooses to plead guilty regardless of any immigration or other consequences from his conviction.

## 7. Defendant's Guideline Range

### A.   Court's Determination

The Court will determine Defendant's guideline range at sentencing.

### B.   Acceptance of Responsibility

The government recommends under Federal Rule of Criminal Procedure 11(c)(1)(B) that Defendant receive a two-level reduction for acceptance of responsibility under USSG § 3E1.1(a). Further, if Defendant's offense level is 16 or greater and he is awarded the two-level reduction under USSG § 3E1.1(a), the government recommends that Defendant receive an additional one-level reduction for acceptance of responsibility under USSG § 3E1.1(b). If, however, the government learns that the Defendant has, after changing his plea, engaged in any conduct inconsistent with acceptance of responsibility—including, but not limited to, making any false statement to, or withholding information from, his probation officer; obstructing justice in any way; denying his guilt on the offense to which he is pleading guilty; committing additional crimes after pleading guilty; or otherwise

demonstrating a lack of acceptance of responsibility as defined in USSG

§ 3E1.1—the government will be released from its obligations under

this paragraph, will be free to argue that Defendant not receive *any*

reduction for acceptance of responsibility under USSG § 3E1.1, and will

be free to argue that he receive an enhancement for obstruction of

justice under USSG § 3C1.1.

### C.    Other Guideline Recommendations

Under Federal Rule of Criminal Procedure 11(c)(1)(B):

- The parties agree that if the court accepts this Rule 11 plea
  agreement, the guideline range will be predicated on a fraud
  loss of more than $1,500,000, but not more than $3,500,000.


- The parties agree that if Defendant is otherwise eligible, he
  shall receive a two-level downward adjustment for certain
  zero-point offenders under USSG § 4C1.1(a) (as amended
  effective November 1, 2023).

- The parties agree that an adjustment under USSG § 3B1.1 (Aggravating Role) Does not apply to the Defendant's conduct.

- The parties agree that Dan adjustment under USSG § 3B1.2 (Minimal/Minor Role) Does not apply to Defendant;'s conduct.

### D.   Factual Stipulations for Sentencing Purposes

The parties have no additional factual stipulations for sentencing purposes.

### E.   Parties' Obligations

Both Defendant and the government agree not to take any position or make any statement that is inconsistent with any of the guideline recommendations or factual stipulations in paragraphs 7.B, 7.C, or 7.D. Neither party is otherwise restricted in what it may argue or present to the Court as to Defendant's guideline calculation.

### F.   Not a Basis to Withdraw

Defendant understands that he will have no right to withdraw from this agreement or withdraw his guilty plea if he disagrees, in any way, with the guideline range determined by the Court, even if that guideline range does not incorporate the parties' recommendations or

factual stipulations in paragraphs 7.B, 7.C, or 7.D. The government likewise has no right to withdraw from this agreement if it disagrees with the guideline range determined by the Court.

## 8. Imposition of Sentence

### A.    Court's Obligation

Defendant understands that in determining his sentence, the Court must calculate the applicable guideline range at sentencing and must consider that range, any possible departures under the sentencing guidelines, and the sentencing factors listed in 18 U.S.C. § 3553(a) and apply any applicable mandatory minimums.

### B.    Imprisonment

#### 1.    Recommendation

Under Federal Rule of Criminal Procedure 11(c)(1)(C), the parties agree that a sentence no higher than 21 months is the appropriate disposition of the case.

### 2.    Limited Right to Withdraw

If the Court rejects the agreement by deciding to impose a sentence of imprisonment on Count 2 higher than permitted by paragraph 8.B.1, Defendant will be permitted to withdraw his guilty plea. That is the only reason Defendant may withdraw his guilty plea. If Defendant decides not to withdraw his guilty plea in those circumstances, Defendant agrees that the Court may impose a sentence on Count 2 higher than permitted by paragraph 8.B.1 and that all other provisions in this agreement will remain in effect.

### C.    Fines

The parties recommend no fine be imposed because the Defendant has agreed to satisfy a substantial  forfeiture judgment as well as a substantial restitution which imposes an adequate financial penalty.

### D.    Restitution

The Court must order restitution to every identifiable victim of Defendant's offense.  Defendant agrees to pay restitution in the amount of $914,360.00 to the victim, Michigan Department of Transportation,

representing one-fifth of $4,571,800.00, which is the Government's calculation of total unpaid restitution.

### E. Forfeiture

Pursuant to 18 U.S.C. § 981(a)(l)(C) together with 28 U.S.C. § 2461(c), Defendant agrees to forfeit to the United States his interest in all property, real and personal, which constitutes or is derived, directly or indirectly, from proceeds traceable to his violation charged in Count 2 of the Second Superseding Indictment.

Defendant also agrees to the entry of a forfeiture money judgment against him in favor of the United States in the amount of $814,640.00, representing proceeds obtained by him as a result of the violation charged in Count 2 of the Second Superseding Indictment. Upon satisfaction of the forfeiture judgment, Defendant shall have no further forfeiture obligations.

Defendant agrees that the forfeiture money judgment will be satisfied  by Defendant tendering certified funds on or before the date of sentencing. the Uninted States in some or all of the following property

(the "[Brian Bartlett Property"), up to the amount of $814,640.00, as agreed to by the parties prior to sentencing and incorporated in a preliminary order of forfeiture:

Should the forfeiture money judgment not be satisfied at the time of sentencing, by the final forfeiture of the Brian Bartlett Property, Defendant explicitly agrees to the forfeiture of any assets he has now, or may later acquire, as substitute assets under 21 U.S.C. § 853(p)(2) and waives and relinquishes his rights to oppose the forfeiture of substitute assets under 21 U.S.C. § 853(p)(l) or otherwise, to satisfy the forfeiture money judgment, including any real property in which he has abn interest. The amount that Defendant owes on the forfeiture money judgment shall be reduced by the net amount of assets forfeited from the defendant to the United States through these criminal proceedings, or in the related civil forfeiture proceeding docket at 20-cv-11973 (the "related civil forfeiture proceeding").

Defendant agrees to the entry of one or more orders of forfeiture incorporating the forfeiture money judgment upon application by the

United States at, or any time before, Defendant's sentencing in this case, as mandated by Fed. R. Crim. P. 32.2. Defendant agrees to sign such an order, indicating he consents to its entry if requested to do so by the Government. Defendant agrees that the forfeiture order will become final as to him at the time entered by the Court. In the event that Defendant withdraws his guilty plea pursuant to ¶8(B)(1)-(2), the parties agree to vacate the forfeiture order and return any funds paid. The government agrees not to take action to enforce the forfeiture judgment until the date of sentencing.

If Defendant has not satisfied the forfeiture judgment in full by sentencing, Defendant agrees to complete and return a Financial Disclosure Form within three weeks of receiving it from government counsel, which may be used in any lawful manner to collect the money judgment amount and/or restitution, and which may be disclosed to any agencies or personnel of the government for that purpose. The financial statement shall disclose and list all assets, funds and property of any kind in which the defendant has an interest, all liens and encumbrances

against such assets, funds and property, and all of the defendant's liabilities. The financial statement must be signed by the defendant under penalty of perjury.

Defendant agrees that he will cooperate with the United States by taking whatever steps are necessary to deliver clear title to property subject to forfeiture under this agreement to the United States and will execute such legal documents as may be required to transfer title to the United States and by taking whatever steps are necessary to ensure that the property is not sold, disbursed, hidden, wasted, or otherwise made unavailable for forfeiture. Defendant further agrees that he will not assist any third party in asserting a claim to the forfeited assets in any judicial forfeiture proceeding and that he will testify truthfully in any such proceeding.

Defendant also agrees to affirmatively withdraw and otherwise not contest the forfeiture of any assets included in a stipulated consent judgment to be entered in the related civil forfeiture proceeding, insofar as necessary to satisfy his restitution and forfeiture obligations.

Upon satisfaction of the forfeiture judgment and restitution by Defendant, the Government agrees to promptly release any claims, liens, or other encumbrances it may have against any interest held only by Brian Bartlett and/or Jessica Bartlett in any property. Upon satisfaction of the forfeiture judgment and restitution by all co-Defendants, the Government agrees to promptly release any claims, liens, or other encumbrances it may have against any property in this matter.

In entering into this agreement with respect to forfeiture, Defendant knowingly, voluntarily, and intelligently waives all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including any Double Jeopardy challenge or other challenge to the above-described forfeiture based upon the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.

Defendant waives the requirements of Fed. R. Crim. P. 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant acknowledges that he understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the Court to advise him of this, pursuant to Rule 11(b)(1)(J), or otherwise, at the time his guilty plea is accepted.

Non-Abatement of Criminal Forfeiture: Defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive him, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if Defendant had survived, and that determination shall be binding upon Defendant's heirs, successors, and assigns, until the agreed forfeiture, including the agreed money judgment amount, is collected in full.

**F. Special Assessment**

Defendant understands that he will be required to pay a special assessment of $100 immediately upon sentencing.

**9. Appeal Waiver**

Defendant waives any right he may have to appeal his conviction on any grounds. If Defendant's sentence of imprisonment does not exceed the guideline range determined by the Court, he also waives any right he may have to appeal his sentence on any grounds.

**10. Collateral Review Waiver**

Defendant retains the right to raise claims alleging ineffective assistance of counsel or prosecutorial misconduct, if he properly raises those claims by collateral review under 28 U.S.C. § 2255. Defendant also retains the right to pursue any relief permitted under 18 U.S.C. § 3582(c) if he properly files a motion under that section. Defendant however, waives any other right he may have to challenge his conviction or sentence by collateral review, including, but not limited to, any right he may have to challenge his conviction or sentence on any grounds

under 28 U.S.C. § 2255 (except for properly raised ineffective assistance of counsel or prosecutorial misconduct claims, as described above), 28 U.S.C. § 2241, or Federal Rule of Civil Procedure 59 or 60.

## 11. Consequences of Withdrawal of Guilty Plea or Vacation of Judgment

If Defendant is allowed to withdraw his guilty plea, or if his conviction or sentence under this agreement is vacated, the government may reinstate any charges against him that were dismissed as part of this agreement and may file additional charges against him relating, directly or indirectly, to any of the conduct underlying his guilty plea or any relevant conduct. If the government reinstates any charges charges as permitted by this paragraph, Defendant  waives his right to challenge those charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

## 12.     Use of Withdrawn Guilty Plea

Defendant agrees that if he is permitted to withdraw his guilty plea on his own motion other than the Court rejecting this plea

agreement, he waives all of his rights under Federal Rule of Evidence 410, and the government may use his guilty plea, any statement that he made at his guilty plea hearing, and the factual basis set forth in this agreement, against him in any proceeding.

### 13. Parties to Plea Agreement

This agreement does not bind any government agency except the United States Attorney's Office for the Eastern District of Michigan.

### 14. Scope of Plea Agreement

This plea agreement is the complete agreement between the parties and supersedes any other promises, representations, understandings, or agreements between the parties concerning the subject matter of this agreement that were made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to Defendant or to his attorney at any time before he pleads guilty are binding except to the extent they have been explicitly incorporated into this plea agreement. If the parties have entered, or subsequently enter, into a written proffer or cooperation agreement,

though, this plea agreement does not supersede or abrogate the terms of that agreement.

### 15.        Acceptance of Agreement by Defendant

This plea offer expires unless it has been received, fully signed, in the United States Attorney's Office by 5:00 p.m. **on July 25, 2025**. The government may withdraw from this agreement at any time before the defendant pleads guilty.

JEROME F. GORGON JR.
United States Attorney


John K. Neal
Chief, Anti-Corruption Unit
Assistant United States Attorney

Karen L. Reynolds
Assistant United States Attorney


T. Patrick Martin
Assistant United States Attorney


K. Craig Welkener
Assistant United States Attorney


Dated: 7/28/25


Page **21** of **22**

By signing below, Defendant and his attorney agree that

Defendant has read or been read this entire document, has discussed it

with his attorney, and has had a full and complete opportunity to confer

with his attorney. Defendant further agrees that he understands this

entire document, agrees to its terms, has had all of his questions

answered by his attorney, and is satisfied with his attorney's advice and

representation.

_____
Jim Amberg
Attorney for Brian Bartlett

_____
Brian Bartlett
Defendant

_____
Mark Kriger
Attorney for Brian Bartlett

Dated: 7/20/25

**ATTACHMENT A**

FACTUAL BASIS

Introduction

1.      From at least February 25, 2011, through at least July 2019, the United States Department of Transportation (USDOT), through the Federal Highway Administration (FHWA), funded highway construction projects in Michigan, typically funding approximately 80 percent of the cost of these projects. The Michigan Department of Transportation (MDOT) was responsible for awarding highway construction contracts and administering the related funds in the state.

2.      Since August 2001, Surveying Solutions, Inc. (SSI), has been a surveying company doing business in the Eastern District of Michigan and has participated in highway construction contracts awarded by MDOT.

3.      At all relevant times, Brian Bartlett was an executive and principal of SSI and together with his co-conspirators, Jeffrey Bartlett (J. Bartlett), Andy Semenchuk, Adam Ball, and Anthony Thelen (collectively, the "Co-conspirators"), held various positions at SSI at various times.

4.      Most of the MDOT contracts in which SSI participated were "actual cost plus fixed fee" (ACFF) contracts. Under such contracts, MDOT reimbursed SSI for: (1) reported direct labor costs; and (2) indirect costs based on costs SSI reported annually in a pre-qualification process that determined the indirect cost overhead rate MDOT used to reimburse and pay SSI (the "overhead rate"). It also paid SSI an additional 11% of SSI's direct labor costs and indirect costs on projects, which represented SSI's profit margin.

5.      In 2005 and 2009, Co-conspirators J. Bartlett, B. Bartlett, and Thelen, Defendant and Co-Conspirator [either J. Bartlett or B. Bartlett] and Thelen created 2SI Development (2SI) and 3SI Building and Leasing (3SI), respectively. These companies held title to personal

A-1

and real property purchased with SSI assets that were then leased back to SSI for its use.

6.    In early 2011, Co-conspirator Andrew Semenchuk created Geo Precision Services, LLC (GPS).

7.    In February 2011, Brian Bartlett and his Co-conspirators entered into an agreement which purported to provide, in part, that each would own a 20 percent undivided interest in SSI, 2SI, 3SI, and GPS (the "Ownership Agreement"). That agreement read in part:

> It is the intent of this agreement that the Buyers and Sellers will each own a 20 percent undivided interest in the above named companies at the completion of the 'Buy In' period. Regardless of how the Articles of Incorporation, Stock Ownership, By Laws, etc. are written/retained; the intent is for all 5 parties to have equal ownership of the companies at the completion of the 'Buy In' period.

8.    On October 24, 2013, as the Co-conspirators agreed, Co-conspirators Semenchuk and J. Bartlett signed MDOT "On-Site Visit" questionnaires falsely certifying that neither they nor any other member of SSI had an ownership interest in another firm.

9.    In late 2015, Brian Bartlett and his Co-conspirators, with intent to defraud, used an existing corporate entity to form "Southfield IT," and used it to create the fiction that Southfield IT provided technology information services to SSI. The Ownership Agreement, as the Co-Conspirators agreed, extended to Southfield IT.

10.    During the conspiracy and scheme to defraud, SSI was responsible for reporting its direct labor cost to MDOT by submitting monthly invoices to MDOT based on aggregated hours that SSI stated its employees worked on MDOT projects, which MDOT paid.

11.    During the conspiracy and scheme to defraud, MDOT also reimbursed SSI for overhead costs as a percentage of current year direct labor costs. The overhead cost rate was determined annually, and SSI

submitted its overhead costs from the prior year for the purpose of determining the current year's overhead cost rate.

## Spousal/Partner Compensation and Inclusion in Overhead Rate

12.    In or around 2011, the defendants agreed that SSI would continue to compensate some of their respective spouses or partners for services they ostensibly rendered to SSI, notwithstanding the absence or actual value of any such services.

13.    In or about March 2011 through December 2018, Brian Bartlett and his Co-conspirators defrauded USDOT, directly and indirectly through MDOT, by submitting false documentation, including timesheets and payroll reports, to MDOT indicating that Jeffrey Bartlett's partner and the spouses of Brian Bartlett, Adam Ball, and Anthony Thelen were "employees" of SSI and fraudulently included the salaries and bonus payments (or portions thereof) paid those individuals in SSI's overhead rate on ACFF contracts with MDOT. This enabled SSI to claim reimbursement from MDOT for overhead costs that were not actually incurred and to which SSI was not entitled, and to receive from MDOT an inflated profit margin on the aggregate overhead expenses to which SSI was not entitled. A portion of these illegally obtained funds were shared equally among the defendants.

## Inclusion of 2SI and 3SI Costs in Overhead Rate

14.    During the conspiracy and scheme to defraud, Brian Bartlett and his Co-conspirators agreed to misrepresent to USDOT, directly and indirectly through MDOT, that Brian Bartlett and Anthony Thelen independently owned and managed 2SI and 3SI and had no ownership stake in SSI. This resulted in artificially increasing 2SI- and 3SI-invoiced expenses in the MDOT projects which MDOT was tricked into reimbursing SSI. This also artificially increased the aggregate overhead profit margin to which SSI, and by extension, Brian Bartlett and his Co-conspirators received but were not entitled.

15. From 2012 through late 2018, on behalf and for the benefit of the Co-conspirators, Co-conspirator Semenchuk made numerous false

A-3

representations to MDOT and USDOT in the context of obtaining and maintaining disadvantaged business entity (DBE) status. These false statements included, but were not limited to:

- In SSI's April 19, 2013 application for DBE status, Co-conspirator Semenchuk falsely stated that he had actual and ultimate managerial control over SSI.

- In a January 2014 letter to USDOT, Co-conspirator Semenchuk falsely stated that: (1) "Brian [Bartlett] and Tony [Thelen] are not . . . key personnel of SSI and they have no power over the affairs of SSI"; (2) "[t]he owners/members of 2si and 3si have no stake in SSI. In addition, the owners/officers of SSI have no stake in 2si or 3si . . ."; (3) "[Co-conspirator Semenchuk] control[s] ALL aspects of [SSI]"; and (4) "None of the SSI owners of officers have any interest or stake in 2si and 3si and none of 2si or 3si owners/members have any interest or stake in SSI."

16.   In addition, Brian Bartlett and his Co-conspirators, made or caused to be made, false statements to USDOT and MDOT claiming that there were lease agreements between 2SI and SSI for mobile surveying scanners and vehicles, as though 2SI was an independent third-party vendor. When those false statements were made Brian Bartlett and his Co-conspirators knew that 2SI was one of several SSI-related companies, in which the Ownership Agreement gave each of them a 20 percent ownership.

17.   Brian Bartlett and his Co-conspirators knew if they disclosed to USDOT and MDOT that, pursuant to the Ownership Agreement, they had co-equal ownership and control over 2SI and its mobile surveying scanners and vehicles, which SSI used for MDOT projects, SSI would only be entitled to reimbursement for normal ownership costs such as maintenance and depreciation. But, if they falsely claimed the mobile surveying scanners and vehicles were leased by SSI from 2SI, SSI they could claim and receive greater MDOT related overhead reimbursement an artificially increased profit margin from MDOT.

A-4

18.   In addition, Brian Bartlett and his Co-conspirators made or caused to be made intentional misrepresentations to USDOT and MDOT in claiming that SSI was making lease payments for SSI office space to 3SI, as an independent business entity. Brian Bartlett and his Co-conspirators knew that, pursuant to the Ownership Agreement, 3SI was one of several SSI-related companies, in which each of them had a 20 percent ownership interest.

19.   Brian Bartlett and his Co-conspirators knew that if they disclosed to USDOT and MDOT that, pursuant to the Ownership Agreement, the had co-equal ownership and control over 3SI and its real property, which SSI leased for office space, SSI would only be entitled to reimbursement for normal real property ownership costs such as maintenance and depreciation. But, if they falsely claimed the real property was leased by SSI from 3SI, SSI could claim and receive greater MDOT projects related overhead reimbursement from MDOT and receive an artificially increased profit margin from MDOT.

### Inclusion of Southfield IT (Data Storage) Costs in Overhead Rate

20. In early 2015, SSI established National Elevation Certificates LLC (NEC) for an unrelated business endeavor that it later abandoned. In late 2015, NEC changed its name to Southfield IT Group (Southfield IT). Brian Bartlett and his Co-conspirators used Southfield IT to trick MDOT into believing that it was an independent company that provided information technology services to SSI. Southfield IT's profits were accounted for as part of the annual year-end equalization among the Co-conspirators.

21.   Beginning in late 2015, Brian Bartlett and his Co-conspirators submitted or caused to be submitted documentation to MDOT which falsely reported that Southfield IT was an independent third-party vendor providing technology services to SSI in support of MDOT contracts. More specifically, Brian Bartlett and his Co-conspirators created or agreed that false contracts and invoices would be created between SSI and Southfield IT and that the false documentation would be submitted in support of those expenses as Overhead Costs to MDOT. In fact, Brian Bartlett and his Co-

conspirators knew that Southfield IT did not actually provide the services it reported to MDOT. As a result, Brian Bartlett and his Co-conspirators caused: (i) SSI to report inflated O/H Costs, and (ii) MDOT to overpay SSI on costs and profits submitted by SSI for payment.

A-6