United States District Court
Eastern District of Michigan
Northern Division

United States of America,                   No. 23-cr-20676

                              Plaintiff,     Honorable Thomas L. Ludington

        vs.

D-4 Brian Bartlett,

                              Defendant.

_____/

## Government's Sentencing Memorandum

At its core this case is simple — lying to get money. But the key role Brian Bartlett (B. Bartlett) played in it, going back to the creation of SSI, is one of the reasons it became complicated and uncommon. The intricacies of the conspiracy increased over the years as new owners of SSI joined, and new illegal income streams were devised. This culminated in the use of relentless and extraordinary tactics executed over many years to cheat the Michigan Department of Transportation out of a staggering amount of money. And as B. Bartlett acknowledged in one of his statements to the F.B.I., they got carried away with how much extra money they were making.

## I.    <u>Background</u>

B. Bartlett pleaded guilty to conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 2). As the Court previously recognized, the charges arise from fraudulent conduct "in three parts," including "fraudulently misrepresent[ing] SSI's overhead and labor costs to artificially inflate MDOT's reimbursement." ECF No. 150, PageID.1623. B. Bartlett and his co-defendants overbilled MDOT through "two separate schemes flush with fraudulent misrepresentations and omissions." *Id.*, PageID.1630.

It is unnecessary to repeat the Court's full recitation of the factual allegations and evidence against B. Bartlett, *see generally* ECF No. 150, PageID.1623–39, but the Court got it right. The government adopts the timeline of relevant case events, the description of the charge to which B. Bartlett has pleaded guilty, and the statement of the offense conduct detailed by the probation department in the Presentence Investigation Report (PSR) dated October 8, 2025. Here, the government focuses on the particular events and facts that are relevant to the sentence this Court should impose on B. Bartlett.

## II.   <u>B. Bartlett's Participation in the Fraud</u>

In August 2001, B. Bartlett, Jeffrey Bartlett (J. Bartlett), and G.S. started SSI. Publicly filed documents including stock purchase agreements, disadvantaged business enterprise (DBE) applications and "no change" affidavits, and MDOT prequalification packages all reported—falsely—that G.S., a minority, was a 51% owner of SSI. B. Bartlett, J. Bartlett, and G.S. were equal owners of SSI and related entities from 2001 until G.S.'s death in 2011. (Exhibit A). B. Bartlett and J. Bartlett continued as equal owners with various co-defendants throughout SSI's corporate life until July 2019. One reason for this artifice was to support SSI's claimed identity as a disadvantaged business. This designation gave SSI, and principal contractors they worked with, a preference when MDOT awarded highway construction projects. Another reason the Bartletts and G.S. created this facade was to facilitate fraudulent billing practices and to inflate reimbursement rates charged to MDOT.

B. Bartlett pleaded guilty to engaging in a fraudulent conspiracy beginning in February 2011, but parts of this scheme began as soon as SSI was established—and B. Bartlett played a role in it from the

beginning. Evidence of his intent can be found in a memorandum drafted for G.S.'s widow after his sudden and unexpected death in February 2011. Because publicly filed corporate documents falsely reported that G.S. was a 51% owner of SSI, the surviving owners needed to set the record straight for his widow to protect their actual ownership interests. This memorandum makes it clear that B. Bartlett and the other SSI owners were—in reality—equal partners and that public records indicating that G.S. was a 51% owner "were so written as to qualify the business as a 'minority owned business' with the State of Michigan Department of Transportation." (Exhibit B). The memorandum included an agreement dated October 15, 2001, signed by Jeffrey D. Bartlett, [G.S.], and Brian M. Bartlett that states "…it is the intention of the parties that they will ultimately be equal shareholders/owners of the Corporation." *Id.*

The memorandum provides the first "bookend" signifying the beginning of what became a multi-year, multi-pronged conspiracy to defraud the United States. Although it is the government's position that B. Bartlett's culpability is not at the same level as J. Bartlett and Semenchuk, it is significant and deserving of a prison sentence.

B. Bartlett's pattern of deliberately fraudulent conduct was not confined to false statements about ownership of SSI and its related entities. From at least 2005, when B. Bartlett and his wife were married, B. Bartlett falsely claimed that his wife, as well as wives of the other owners, were employees of SSI and included their salaries and bonuses as reimbursable expenses to MDOT. From 2011–2019 alone, B. Bartlett reported hundreds of thousands of dollars in payroll and bonus expenses for his wife. MDOT calculates that from 2012 through 2018, it overpaid SSI $1,817,983.39 because of falsified payroll expenses claimed for the defendant-owners' wives and domestic partner. (Exhibit C).

In 2002, Anthony Thelen joined SSI. By at least 2004, he shared equally in the profits of SSI and its related entities with J. Bartlett, B. Bartlett and G.S. In 2004, all four owners agreed to create 2SI, an LLC they used to hold title to SSI vehicles and equipment. The defendant-owners[1] falsely told MDOT that 2SI was an independent third-party

_____

[1] B. Bartlett and his co-defendants have argued they were not equal owners of SSI, 2SI, 3SI, and Southfield IT (SFIT), because publicly filed documents reported that J. Bartlett and Semenchuk owned SSI, B. Bartlett and Thelen owned 2SI and 3SI, and Adam Ball and his wife owned SFIT. But all five defendants shared equally in the profits of SSI,

vendor of SSI. Lying about it allowed SSI to claim significantly more reimbursable expenses from MDOT on highway projects. This artifice was repeated and certified in SSI prequalification packages every year until July 2019. MDOT calculates that it overpaid SSI $8,028,285.98 for equipment and vehicle costs relating to 2SI and falsely claimed by SSI. (Exhibit C).

In 2009, B. Bartlett and the other defendant-owners of SSI created 3SI an LLC they used to hold title to real estate. Again, they lied to MDOT about the relationship 3SI had to SSI by falsely claiming 3SI was an independent third-party vendor. This enabled B. Bartlett and the other defendant-owners to claim substantially more in reimbursable expenses then they were entitled to. MDOT calculates that it overpaid SSI $911,158.38 for falsely claimed real estate costs relating to 3SI. (Exhibit C).

---

2SI, 3SI, GEO, and SFIT. These entities shared resources, including an office manager and bookkeeper. Management decisions for all the entities were made by all five defendants and money routinely moved between the entities at their direction. In secret agreements the defendant-owners referred to each other as equal owners regardless of what publicly filed documents reported. And most importantly, the defendants conducted the business of SSI, 2SI, 3SI, GEO, and SFIT as one entity. Because of their conduct, the government refers to them as owners or defendant-owners.

By the time G.S. died, J. Bartlett had for some time been negotiating with Andrew Semenchuk to join SSI as another owner. Shortly after G.S.'s death, Semenchuk left his job at MDOT and joined SSI. With this addition and that of Adam Ball, the defendant-owners needed to clarify their relationship to each other and the various SSI entities. On February 25, 2011, the defendants executed a new secret agreement in which they acknowledged they were equal owners of SSI and each of its related entities, regardless of what any publicly facing corporate documents stated. (Exhibit D).

On March 14, 2011, B. Bartlett sent an email to the defendant-owners containing two versions of SSI's ownership and its related companies. The first version divided ownership of 2SI, 3SI, and SSI in a way that fraudulently supported higher reimbursement claims to MDOT and supported SSI's DBE efforts. The second—and accurate version—confirmed the defendant-owners' intent that they owned the entities equally. The truthful version controlled how they managed SSI and what compensation B. Bartlett, and his co-defendants received.

7

On April 19, 2011, B. Bartlett sent an email to the other defendant-owners, urging them to get on the same page so they could "keep all of our lies straight so we don't look like idiots." (Exhibit F). And B. Bartlett wasn't the only defendant-owner trying to manage the lies they were telling. On November 11, 2011, J. Bartlett sent an email to the other defendant-owners of SSI and bragged that "I am still planning on calculating the overhead rate so that we get where we want it. Then we can have them review and 'rubber stamp' it…so to speak." (Exhibit G).

By the end of June 2012, the defendant-owners were finalizing the details of their plan to hold Semenchuk out as the 51% owner of SSI. This prompted Ball to circulate a new version of the secret agreement for the defendant-owners to execute. Again, they agreed that they were all 20% owners of all SSI related entities, regardless of what SSI documents said publicly.

By November 2013, Semenchuk was frustrated with how long MDOT was taking to process SSI's application for DBE status and he circulated a draft letter to B. Bartlett and the other defendant-owners seeking concurrence in its tone and substance, which he received.

8

(Exhibit J). The letter is lengthy, aggressive, and full of false and misleading statements. Semenchuk ended the letter: "SSI's viability and existence does not rely in any other firm but itself. I can replace all my vendors tomorrow including [2si] and [3si] and continue to function independently." *Id.* On December 19, 2013, MDOT denied SSI's application for DBE status. On July 25, 2015, based on the false and fraudulent statements made by Semenchuk and approved by B. Bartlett and the other defendant-owners, USDOT overruled MDOT and granted SSI DBE status.

By August 28, 2014, when SSI was deep into its effort to qualify as a DBE, J. Bartlett, sent an email to the defendant-owners bragging: "Not bad for a bunch of white guys trying to be a minority-owned business… And we will be billing the FUCK out of August thru November for sure." And this was not just conceit. By September 2014, the defendant-owners were putting this billing promise into action. On September 25, 2014, J. Barlett sent an email to the defendant-owners suggesting how they could artificially inflate billings for September, October, and November. (Exhibit H). The conversation included giving the wives "…bigger raises to help with overhead…" And "coming up

9

with additional scanner charges."  Another idea was to raise the defendant-owners' reported hours. *Id.*

By the end of December 2014, Ball and Semenchuk had completed their buy-in obligations and were able to share fully in SSI's profits. On December 31, 2014, Semenchuk proposed forming an IT company "for overhead purposes." B. Bartlett responded: "Sounds pretty crafty – I like it." (Exhibit I). Beginning in 2015, SSI started fraudulently billing MDOT for IT costs that it did not incur. MDOT calculates that it overpaid SSI $1,928,372 based on these false billings. (Exhibit C).

As time went on, B. Bartlett and his co-defendants successfully and fraudulently obtained DBE status for SSI, continued to bill MDOT for payroll and IT services SSI did not incur, and inflated reimbursement from MDOT by hiding the true relationship between 2SI, 3SI, and SSI. At the end of every year, a thorough report was generated which equalized all the profits, losses, and obligations of SSI and all its entities and split the net profits equally between the defendant-owners. And every year SSI filed a prequalification package with MDOT containing false information to calculate an inflated overhead rate for reimbursement.

10

B. Bartlett and his co-defendants may claim to be as equal in their culpability as they were as partners in and owners of SSI. But such a claim would be as false as their representations to MDOT.  B. Bartlett 's scheme to defraud MDOT reaches back to the very inception of SSI and continued until the execution of search warrants on July 25, 2019, the final bookend of the conspiracy. From the beginning, the true ownership of SSI was concealed from MDOT, and wives were used to inflate payroll costs. As time went on and the company grew in size and reputation, the false statements continued and expanded along with it.

When considering the appropriate sentence for B. Bartlett, it is the government's position that B. Bartlett played an important role—similar to Ball, greater Thelen—but is not as culpable as J. Bartlett and Semenchuk. The government recommends that the court impose a sentence of 18 months.

## B. Bartlett's statements to the F.B.I.

On July 26, 2011, B. Bartlett gave a statement to the F.B.I. His admissions and explanations provide valuable insight into his intent and motivation during the conspiracy. (Exhibit K). Bartlett began by admitting that his wife was a stay-at-home parent and that 2SI was a

"shell company," with no other clients but SSI. B. Bartlett admitted that the payments SSI made to 2SI increased SSI's overhead rate, that it was wrong, and that all five of them knew it was wrong. *Id.* He admitted that his wife was on SSI's payroll and that those costs were included in overhead. And he admitted that he and his co-defendant-owners created SFIT to funnel money to Ball. When the agents asked him if they got carried away with how much money they were making, B. Bartlett agreed. He agreed again that they created the shell companies to line their pockets. At the end of the interview B. Bartlett said, "I'll tell ya. 2SI wrong. 3SI wrong. Southfield IT group, wrong.… I'm very sorry."

Before the interview concluded, B. Bartlett wrote an apology letter. (Exhibit L). He starts the letter by explaining how hard he and the other owners worked to make SSI a success. But as the company began to grow, they created 2SI, 3SI, and Southfield IT as a mechanism to "equal money amongst the owners." *Id.* And he was sorry they did it. B. Bartlett admitted that the "mechanisms were used in a terrible manner in order to inflate our costs which built overhead and made our

overhead higher causing the State of Michigan to pay higher invoices."
*Id.*

## III.  Sentencing Guideline Calculations

### A.  Base Level - 6:  USSG 2B1.1(a)(1)

B. Bartlett pleaded guilty to one count of conspiracy to defraud the
United States in violation of 18 U.S.C. § 371. The maximum possible
penalty is 5 years imprisonment. This guideline provision sets the base
level at 6. (PSR ¶ 49).

### B.  Loss:  USSG 2B1.1(b)(1)(J): +16

The PSR correctly applies a 16-level upward adjustment,
pursuant to § 2B1.1(b)(1)(I), because the fraud loss exceeds $1.5 million.
(PSR ¶ 50).

In determining the amount of loss, the district court is to
determine it by a preponderance of the evidence. *United States v.
Triana*, 468 F.3d 308, 321 (6th Cir. 2006). The court is not required to
compute the loss with precision, and it need only make a reasonable
estimate of the loss given the available information. *Id*. at 320;
USSG § 2B1.1, comment. n.3(B).

The parties agree that if the Court accepts the plea agreement, "the guideline range will be predicated on a fraud loss of more than $1,500,000 and less than $3,500,000." ECF No. 268, PageID.3031.

### C.   Restitution

This court must order restitution, pursuant to 18 U.S.C. § 3663A, for monetary losses suffered by any individual or entity who was a victim of the fraud scheme. B. Bartlett agreed to pay restitution in the amount of $914,360.00 to the victim, Michigan Department of Transportation, representing one-fifth of $4,571,800.00, which is the Government's calculation of total unpaid restitution. ECF No. 270, PageID.3064).

## IV.  Application of 18 U.S.C. § 3553

Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. In order to determine the "particular" sentence to impose, this Court must consider the familiar statutory factors listed in §3553(a)(1)–(7).

The probation department calculates B. Bartlett's guidelines at 24-30 months. (PSR ¶ 93). If the Court accepts the plea agreement, B.

14

Bartlett's sentence would be capped at 21 months. After consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a), the appropriate sentence for B. Bartlett is 18 months.

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

B. Bartlett's offense was complex, highly orchestrated, and devastating to the trust that the State of Michigan, USDOT, and MDOT gives self-reporting companies to whom they award contracts. B. Bartlett engaged in an extensive, well-planned scheme to defraud over the course of 18 years that, just in 2012–2018, involved over-payments by MDOT to SSI of more than $12 million. The conspiracy required B. Bartlett's daily attention and effort to keep it from being discovered. His scheme demonstrated disrespect for the law and for the basic moral and ethical behavior expected. And it was well within his power to cease his criminal activity at any point. But the money was just too good.

### B. The History and Characteristics of the Defendant

Given his background, family support, employment history, education, and extensive connections to the community, B. Bartlett had every opportunity to succeed and thrive in the legitimate career he chose. Unlike many criminal defendants who resort to crime out of financial desperation, B. Bartlett did not devise his scheme in the face

of economic privation. Instead, he purposely and intentionally orchestrated a multi-pronged scheme that was both extensive and complex. But at its core, it was a quintessential example of "lying to get money" driven purely by greed.

The Court will no doubt hear B. Bartlett, and his co-defendants offer excuses, chief among those: "But we did the work and did it better than anyone else." There was nothing more important to the success of the conspiracy and scheme than the fact that SSI did the work and did it well. It tricked MDOT into awarding contracts based on lies and likely contributed to MDOT giving SSI the benefit of the doubt once questions arose. B. Bartlett understood that SSI was taking advantage of MDOT's good opinion of them. Rather than feeling any shame or contrition for his actions at the time, he treated it as a green light to continue the scheme and to find even new ways to increase illegally gained profits from MDOT as the years passed.

B. Bartlett and his wife are the parents of a profoundly disabled son. With good reason he may be asking the Court to consider the extra burden a prison sentence would place on his family, especially on his care-giver wife. While the government is empathetic to the challenges

16

those circumstances present, it should not be a reason for the Court to reduce B. Bartlett's sentence. The burden of a custodial sentence on a defendant's family is an inevitable consequence of choices made by the defendant. B. Bartlett took a risk, benefitted from that choice, but got caught. Unlike the vast majority of defendants, he has significant financial resources that can be used to help his son and family during his term of incarceration. And that term is likely to be significantly less than he would have faced absent his plea agreement with the government.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, To Promote Respect for the Law, and to Provide Just Punishment for the Offense.

A sentence of 18 months would reflect the seriousness of the offense, promote respect for the law, and adequately punish B. Bartlett for his criminal behavior. While B. Bartlett pleaded guilty to engaging in an eight-year conspiracy to defraud the United States that caused significant financial harm to MDOT, parts of the scheme began in 2001. Such repeated, serious criminal behavior calls for a prison sentence to punish B. Bartlett and promote respect for the law.  A sentence of 18 months is adequate to achieve those objectives.

**D.**   **The Need to Afford Adequate Deterrence to Criminal Conduct and To Protect the Public From Further Crimes of the Defendant**

A sentence of 18 months is necessary to deter others as well as to protect the public from further criminal activity of B. Bartlett.

The justice system must send a clear message to those inclined to engage in widespread fraud—especially involving highway construction contracts—that such conduct will result in a prison sentence. A sentence of 18 months will achieve this objective. A sentence below the 18 months will lessen the deterrent effect on others who might face the same temptation as B. Bartlett.

**E.**   **The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

There is no need in this case to adjust the sentence below the guideline range in order to provide B. Bartlett with "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(D). The prison system can accommodate all of B. Bartlett's medical conditions and it is unlikely that he needs to seek further educational opportunities.

**F.     The Need to Avoid Unwarranted Sentence
Disparities Among Defendants with Similar Records
Who have been Found Guilty of Similar Conduct**

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984.  Reference to the guidelines, coupled with careful consideration of the § 3553(a) factors relevant to a specific defendant, is the only available means of preventing the disfavored result of basing sentences on the luck-of-the-draw in judicial assignments. Accordingly, the Supreme Court has held that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process" in order to assure fair, proportionate, and uniform sentencing of criminal offenders.  *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).

Here, the parties have agreed to cap B. Bartlett's sentence at 21 months if the Court accepts the plea agreement. But taking into consideration B. Bartlett's relative culpability compared to J. Bartlett and Semenchuk, a sentence of 18 months, although lower than the guidelines calculated by the probation department, would not create any inappropriate disparity.

19

## V.       <u>Conclusion</u>

Based on the extent of B. Bartlett's conduct and the significant role he played in the conspiracy, the government urges this Court to impose a sentence of 18 months in prison.

Respectfully submitted,

JEROME F. GORGON JR.
United States Attorney

 s/ Karen L. Reynolds
Karen L. Reynolds
William J. Vailliencourt, Jr.
Assistant U.S. Attorneys
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9672
karen.reynolds@usdoj.gov
william.vailliencourt@usdoj.gov

Dated:  November 13, 2025

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2025 , I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record.

s/ Karen L. Reynolds
Karen L. Reynolds  (P31029)
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9672
karen.reynolds@usdoj.gov
